## Aycinena *against* Peries.

6ws243
136  680
6ws243
158  48

The commissioners under the Spanish treaty awarded a large sum of money to be paid to J. Y. for himself and others. J. Y. was the agent of certain shippers, owners of property seized in South America by the Spanish government, and the plaintiff, an attorney there, had a claim on the fund for services and advances recognised by J. Y. and others interested.

*Held*, 1. That it was a decree in favour of the plaintiff for the amount of his claim.

2. That all parties having acquiesced in the justice of the plaintiff's claim, it amounted to an appropriation, and equity would direct the money to be brought into court and award payment out of it first to the plaintiff.

3. That the plaintiff had constructive possession of the fund and an equitable lien on it, from his having been the efficient person by whose means the money was ultimately recovered, and having parted with the documents at the request and for the convenience of the other parties interested.

A defendant holding funds in his hands as a stakeholder or for the benefit of others, may be sued in *assumpsit* for money had and received and a special judgment and execution had on equity principles applied in Pennsylvania in common law forms of proceeding, and the court will control the execution of the process by ordering the money to be brought into court or otherwise.

[Aycinena v. Peries.]

The Act of Assembly conferring on the courts chancery power in certain cases, does not oust the jurisdiction of the common law courts exercising equity under common law forms. They are concurrent remedies, and a plaintiff may elect either.

One having funds in his hands as stakeholder or agent for others, may be sued, though he has never been called on to settle his accounts in the Common Pleas, and though he is administrator *de bonis non* of one from whom the funds passed; such property forming no part of the estate of the testator, and not being within the jurisdiction of the Orphan's Court to settle and distribute.

Bringing suit against the personal representatives of such testator does not conclude the party interested from proceeding against the fund, inasmuch as he has two remedies, *in rem* and *in personam*, and may pursue both till satisfaction.

An award of money by the commissioners under the Spanish treaty, excluding such persons as are not citizens of the United States, does not exclude an attorney in a foreign country, who for advances and services there has a lien on the fund claimed and awarded.

THIS was an action of *assumpsit* for money had and received, brought in this court by Mariano de Aycinena, executor of Juan Fermin de Aycinena, against Adolphus Peries. It was tried before ROGERS, J., at Nisi Prius, and now came before this court on certificate of error. The facts are fully stated in the opinion of the court.

The case was argued by

*W. B. Reed* and *Meredith*, for the plaintiff in error.
*Binney, Jun.* and *Randall*, contra.

The opinion of the Court was delivered by

ROGERS, J. — This is an action for money had and received, in the nature of a bill in chancery, to recover a fund in the hands of the defendant, in payment of the amount of a judgment recovered by the plaintiff from the defendant as the administrator of James Yard, deceased. After the evidence was closed, the court charged the jury, that this was an action for money had and received, brought by the executor of Fermin de Aycinena against A. Peries. That to maintain the action it was necessary for the plaintiff to show that he did now, or at one time had owned the money sought to be recovered. That there was a fund which had come into the hands of the defendant when he took letters of administration to Mr Yard's estate, and whether it came into his hands as administrator, as attorney for the executrix or as trustee, was entirely immaterial. That the defendant was only responsible for the administration of the fund since the death of Mrs Frelinghuysen. That the plaintiff, in point of law, had a right to this fund in the hands of the defendant, superior to that of the co-shippers of the Asia and the Dolly, or any other person, except the Marquis Vicente de Aycinena. That the plaintiff by bringing his suit for the same claim against the defendant as administrator, or against Mrs Frelinghuysen as executrix of Mr Yard, had not impaired his right to or concluded himself from proceeding against this fund. That

[Aycinena v. Peries.]

the fact of the accounts of the defendant as administrator *de bonis non* of James Yard, including the accounts of this whole fund, having been filed in the Orphan's Court and being now before an auditor, afforded no defence in this case, notwithstanding the counsel for the plaintiff had appeared and taken part before the auditor and had the defendant under examination in relation to the accounts of this fund. And finally, that in point of law the plaintiff was entitled to recover. The jury, under the direction of the court, found the following verdict:

" The jury find for the plaintiff the sum of $49,580.19. This sum is composed of the following items:

| | |
|---|---:|
| Amount of compromisé paid to Echevaria at Guatemala by plaintiff, as Yard's attorney, in the business of the Asia and Dolly, December 19, 1816, with interest, | $23,460.39 |
| Amount of judicial costs paid by plaintiff at Guatemala, in the same business, Dec. 31, 1821, with interest, | 14,649.95 |
| Amount of money paid by plaintiff for expenses at Guatemala, in same business, with interest, | 3,420.47 |
| Amount of commissions, 7-12ths of 6 per cent. commission on $202,349.87, for plaintiff's services, with interest, | 8,049.38 |
| | $49,580.19 |

Subject to the opinion of the Judge upon the law and evidence, with liberty for the defendant to take an appeal by bill of exceptions to the Supreme Court, agreeably to the Act of Assembly. In case judgment should be rendered finally for the whole or a part of the verdict, then the plaintiff shall be at liberty to issue execution, or process in nature thereof, and levy on or attach the notes, stocks and securities in the schedule annexed, now held by the defendant as administrator *cum testamento annexo* of James Yard, said judgment not to be entered against the defendant generally, but only for the purpose of levying upon or attaching and selling the said notes, stocks and securities. Execution to be issued subject to the right of the Marquis of Aycinena, under the direction of the court."

In the trial, to the charge of the court and to the verdict of the jury, the defendant has filed the following specification of errors:

1. The admission in evidence of the memorial of James Yard, dated 22d February 1822.

2. The admission in evidence of the several documents referred to in the 2d bill of exceptions.

3. The Judge erred in charging the jury that in point of law the plaintiff had a right to the fund in the hands of the defendant, superior to that of the co-shippers in the Asia and Dolly, or of any other person, except the Marquis Vicente de Aycinena.

4. In saying that the plaintiff, by bringing his suit for the same claim against the defendant as administrator, or against Mrs Frelinghuysen as executrix of Mr Yard, had not impaired his right to or concluded himself from proceeding against the fund.

VI. — V*

5. In saying that the fact of the accounts of defendant, as administrator of Yard, including the account of the whole of this fund, having been filed in the Orphan's Court and being now before an auditor, afforded no defence in the case, notwithstanding the plaintiff's counsel had appeared and taken part before the auditor, and had the defendant under examination in relation to the accounts of this fund.

6. In saying that in point of law the plaintiff was entitled to recover.

Under these errors all the points made in the argument may be fairly considered. The following facts will give a general outline of the case.

In the year 1800 James Yard, in behalf of himself and others, shipped by the ship Asia and the brig Dolly, to South and Central America, valuable cargoes. The shippers on board the Asia and the Dolly were not the same, but different persons; but, so far as it appeared to the world, James Yard was the owner of the vessel and cargo, it having been left entirely out of view that any other persons were concerned in the shipments. The cargoes, on their arrival at Callao, in the year 1801, were seized by the order of the government of Peru, and the proceeds deposited in the royal treasury at Lima. Mr Yard, in consequence of his severe loss in this adventure, took the benefit of the Bankrupt Law, and, in the year 1803, representing his assignees and other persons who were concerned in the shipment in question, from whom he had received the most full and plenary powers, went to Spain to seek redress. In the prosecution of this claim by virtue of said powers, which were never revoked or in any way questioned, but always ratified and confirmed by the persons interested, Mr Yard, who held himself out as the owner of the ship and cargo, with the assent of the shippers, appointed in 1808 the Marquis of Aycinena as his agent to prosecute the claim on the government of Guatemala, for the unlawful seizure of these cargoes. The Marquis of Aycinena during his lifetime prosecuted the claim, and, upon his death, Fermin de Aycinena, his brother and executor, succeeded, according to the laws of Guatemala, to the agency, which thus devolved upon him. Fermin de Aycinena carried on the business of his agency, laid out and expended monies in behalf of the agency and necessarily connected with its successful prosecution, gave his diligent services in the business, and kept Mr Yard, whom alone he knew in the transaction, apprised of the state of the business. Mr Yard recognised him as his agent.

Fermin de Aycinena having prosecuted the claim upon the government of Guatemala for many years, finally established the rights of Mr Yard and obtained a decree for the payment of the money. The money was decreed to be paid to Fermin de Aycinena himself, without any mention of his principal, Mr Yard. Just as Fermin was about to receive the amount so decreed to be paid to

[Aycinena v. Peries.]

him, the taking of Pensacola suspended the proceedings, and shortly afterwards the Florida treaty was promulgated, which transferred the settlement of the claim from the Spanish government to a commission created at Washington.

In a letter from Mr Yard to the Marquis of Aycinena dated April 17, 1815, he acknowledges the services of the Marquis, and says : " It is now understood that some arrangement is about to be made between the governments (Spain and the United States) for adjusting all claims, as well private as public, and that commissioners will be appointed, as in former instances, before whom the claims will be substantiated. It is my intention, in this case, to bring my whole case before them, from the commencement to its conclusion. In order to do this effectually, the documents respecting the decision of the arbitrators in the concerns of the creditors, as well as any others that may have taken place in regard to my affairs subsequently to the last which your exccellency sent me, will be necessary, and I shall be thankful to have them sent to me as soon as possible."

Under this commission Mr Yard, in behalf of himself and the other shippers, who had, as before stated, duly constituted him their attorney in fact, presented his memorial to the commissioners under the Florida treaty. In this he acknowledges the services rendered by Fermin de Aycinena, as his agent, and refers to the documents and letters forwarded to him from both Fermin and the Marquis de Aycinena, as vouchers to sustain his case.

The board, at first, rejected the claim, but afterwards, viz. 16th February 1824, made the following order :

" Ship Asia, Peterson, — Brig Dolly.—The board having heretofore received, examined and allowed this claim as valid, this day proceeded to ascertain the amount thereof, and do award to the claimants the sum of one hundred and thirty-six thousand two hundred and sixty-five dollars, in full, for the loss sustained in the arrest of those vessels at Callao by order of the Spanish authorities, and the sale of their cargoes in 1801, *which sum is to be paid to James Yard for himself and others.* $136,265.96."

This fund was always kept separate and distinct from his own property. It was so treated by Mr Frelinghuysen and by Mr Peries, the defendant. Mr Peries expressly says, that the fund had never been considered by Mr Yard or any one else as in the remotest manner connected with his (Yard's) estate, but, on the contrary, was placed in Mr Peries' hands for the express purpose of keeping it distinct therefrom.

That the parties knew of this claim appears from a letter of the 5th August 1835, to Messrs Ingersoll and Chauncey : " It is necessary further to state that the *representatives* of the Marquis of Aycinena have brought forward a claim upon the fund amounting

[Aycinena v. Peries.]

to more than $40,000, for his services and expenses in Guatemala and Peru. It is understood that the representatives insist upon the whole amount, and are about to commence a suit. Of course, whatever they may recover will constitute a deduction, the nature and application of which to the different interests cannot now be ascertained."

Mr Peries, in a letter dated October 9, 1834, addressed to the young Marquis of Aycinena, says: " J. Yard made a claim to reserve a sum to provide for expenses incurred at Guatemala. The amount estimated to be sufficient for this purpose was $5000, and a proportional part of that sum was allowed to be reserved."

The case will be considered in the order of the exceptions; and, as to the two first, it is enough to say they have been abandoned. The facts which bear upon the third error, which are borne out by the testimony in their fullest extent, established by proof which cannot be controverted or denied, are chiefly these. James Yard was to all the world, and particularly to the Marquis of Aycinena and his successor, the owner of the ship Asia and the brig Dolly and their cargoes. As between them no other person was known in the transaction. Mr Yard was the principal, and they were his agents. In consequence of the unremitted attention of the agents to the business intrusted to their care, continued for a long space of time, repeatedly acknowledged by Mr Yard, and about the value of which there can be but one opinion, together with the expenditure from their private funds of a large sum of money to effect a compromise with a person of the name of Echeverria, and the payment from the same source of other large sums of money for legal costs incurred in the regular prosecution of the claim, and which, it appears, were absolutely necessary to its successful termination, he at length, after great delay, succeeded in obtaining a decree that the amount of the claim, viz. $202,000, should be made to him, Fermin de Aycinena. No notice is taken of Mr Yard, but the decree is that the money be paid to the plaintiff, who alone, under that adjudication, was authorized to receive it. After that decree nothing remained but to receive and transmit the money to his principal. Of the precise state of the business Mr Yard was regularly informed. In a letter dated the 18th July 1818, the plaintiff announces to his principal that all difficulty as to the receipt of the money in the treasury at Lima, was removed, and he offered, as soon as he was put in possession of it, to remit the same in indigo, furnishing, at the same time, a specific note of the quantity, quality and price. And in a subsequent letter dated the 3d September 1818, he advises Mr Yard of his having a decree for the amount of the fund in the treasury at Guatemala, which had been transferred from that of Lima by order of the president of Guatemala. At this time such progress had been made (as appears from the memorial of Mr Yard) that it only remained to receive the official order of the president of Guatemala for payment.

[Aycinena v. Peries.]

of the amount claimed, in consequence of which, viz. the expectation of the immediate receipt of the money, the proposition for a remittance was made.   Matters stood in this condition when the business was suspended by the news of the taking of Pensacola and the strong probability of an immediate rupture between the United States and Spain.   But for this untoward event, the money awarded would have gone into the actual possession of the plaintiff; and, had it been received by him, no person will question his right to retain for his services and expenditures; for it cannot be denied that in cases of agency there exists a particular right of lien in the agent for all commissions, expenditures, advances and services in and about the property or thing intrusted to his agency, wherever they were proper or necessary, or incident to the business.   That the expenditures and services of the plaintiff were of that description, has been established by the verdict of a jury, and also by the most positive proof, arising from unqualified admissions of the parties of their highly meritorious and useful character.   Indeed, from a survey of the facts in evidence, we cannot withhold our belief that without the powerful and efficient aid of the agents, this fund would never have been realized.   Thus the parties stood, when, as a consequence from the Florida treaty, the case was transferred from Guatemala to the city of Washington. Then it was that Mr Yard, armed with the documents furnished by the plaintiff, and particularly the decree, which established the right to remuneration from Spain, presented his memorial to the commissioners.   The first attempt was unsuccessful; but afterwards, viz. 29th July 1823, the board proceeded as follows:

" James Yard, for himself and others. — Ship Asia and brig Dolly.

" Upon examination of the testimony filed in support of this claim, the board are of opinion that it be allowed as valid for their proportion of the nett proceeds of the cargoes of these vessels deposited in the royal treasury at Lima.   From which must be deducted such sums as are claimed by those who are not citizens of the United States; and also any sum which is claimed under any person who was not such citizen at the time of the loss."

On the 16th February 1824 the board proceeded to make a final decree.

" Ship Asia, Peterson,—Brig Dolly.—The board having heretofore received, examined and allowed this claim as valid, this day proceeded to ascertain the amount thereof, and do award to the claimants the sum of one hundred and thirty-six thousand two hundred and sixty-five dollars, in full for the loss sustained in the arrest of those vessels at Callao by order of the Spanish authorities, and the sale of their cargoes in 1801.   *Which sum is to be paid to James Yard for himself and others.*   $136,265.96."

[Aycinena v. Peries.]

When it is remembered that the decree in Guatemala was that the money should be paid to Fermin Aycinena, and that this document was the foundation of the award of the commissioners, it would not have been unreasonable for him to suppose that the decree of the commissioners should order the money to be paid to him in whom the legal title to the money was vested; and, had this been done, the plaintiff would have had the right, as no person can dispute, to appropriate the proceeds, in the first instance, to the repayment of his advances on account of the fund, and in payment for the services he had rendered in and about this *compli*cated business. But this, which, it may not be going too far to say was the legal course, the commissioners, for some reason, did not think proper to pursue. Influenced, perhaps, by the fact that the plaintiff was a foreigner at a distance, and that Mr Yard was a citizen and on the spot, and that there had already-been great delay in obtaining redress for the injuries the shippers had sustained, they make a special decree, by which they direct the money to be paid to *James Yard, for himself and others.* The commissioners do not undertake to ascertain those persons interested in the fund, but they leave that to future inquiry. What, then, is the construction that we ought to give this decree? and, it appears to me, that from a consideration of all the facts connected with the transaction, the decree includes the rights of the plaintiff as well as others interested in the fund; that it is a decree in favour of Fermin de Aycinena, who was legally entitled to recover the money, and Mr Yard held subject to his claim and to the amount of his legal responsibility. It also appears to me that the fund is primarily liable to the extent of his debt, and upon every fair principle should be first paid; because, although a strictly legal right of retainer may not exist, yet there is an overwhelming equitable claim to a portion of the fund arising from his meritorious services, by which, in truth, the fund received its being. The case must be treated precisely as if the money was now in court for distribution; for the suit, as will hereafter appear, is but a means of giving this court a control over the fund, in which event a Court of Chancery would do justice to the parties by ordering the amount of the plaintiff's claim to be first paid, and the balance, whatever it may be, to be paid to the shippers. It would be against all the principles of equity to order the money to be paid to the shippers, and turn the plaintiff over to a remedy against them, or to a more than doubtful remedy against an insolvent estate. Having the fund under their control and all the parties, they would have the power to do justice in the manner above stated. And this is unquestionably the view taken of it by the parties in interest. Mrs Frelinghuysen, the executrix of Mr Yard, in a letter to Mr Peries, and in answer to one from Messrs Ingersoll and Chauncey on behalf of the persons interested in the fund recovered under the Florida treaty, says: " You will also notice

to those gentlemen (Messrs Ingersoll and Chauncey) the claim made by the representatives of the late Marquis of Aycinena, which, if established, will most seriously affect the amount to be distributed." In compliance with this, Mr Peries, in a statement accompanying a letter to Messrs Chauncey and Ingersoll dated the 5th August 1835, says : " It is necessary further to state that the representatives of the Marquis of Aycinena have brought forward a claim upon the fund amounting to more than $40,000, for his services and expenses in Guatemala and Peru. The account has been exhibited to the counsel of the creditors, Messrs Chauncey and Ingersoll. It is understood that the representatives insist upon the whole amount, and are about to commence a suit. Of course, whatever they may recover will *constitute a deduction*, the nature and application of which to the different interests cannot now be ascertained." So also Mr Peries, in an answer to a letter from the Marquis of Aycinena asking information as to the amount of the fund and its disposition, says : " J. Yard made a claim to reserve a sum to provide for expenses incurred at Guatemala. The amount estimated to be sufficient for this purpose was $5000; and a proportional part of that sum was allowed to be reserved in making the payments above stated, which, of course, is subject to the same contingencies as the payments."

Thus it appears that all parties interested in the fund, without exception, acquiesced in this disposition of it, showing thereby their construction of the award, and further showing a distinct appropriation of the proceeds as primarily liable for the payment of these claims. It was the understanding of all the parties that the persons interested in the shipment were only entitled to the balance which remained after paying for the services rendered by the agents, which, in their apprehension, constituted a proper deduction from the amount of the fund. If, then, this amounts to an appropriation of the money, which it unquestionably does, a Court of Chancery will not suffer it to be distributed. All the parties having assented to the appropriation, the fund comes into the hands of Mr Yard clothed with a trust, and this by the act of the persons competent to create and establish it. This head of equitable jurisdiction is noticed by Judge STORY, in his *Equitable Jurisprudence, page* 307. And in *Clemson* v. *Davidson*, (5 *Binn.* 398), Chief Justice TILGHMAN says : " Any order, writing or act, which makes an appropriation of a fund, amounts to an equitable assignment of that fund. The reason is plain, the fund being neither assignable at law nor capable of manual possession, an appropriation of it is all that the nature of the case admits. A court of equity will therefore protect such appropriation and consider it as equal to an assignment."

This case does not come, as may be safely admitted, within the general principle of lien ; for a lien is defined to be a right in one man to retain that which is in his possession belonging to another,

until certain demands of him, the person in possession, are satisfied.   Goods subject to a lien are in the nature of a pledge, which, being personal, cannot be transferred: so that if the goods are parted with, the lien, in general, is lost.   But this rule is subject to qualification.   For, where an agent who has a lien on property to a certain amount, deposits it as a security to that amount, apprising him of the lien and appointing him to keep possession*as his servant, the lien is not thereby extinguished.   *M'Combie* v. *Davies*, (7 *East* 7); *Man* v. *Shiffner*, (2 *East* 529).   Where securities, on which the holder had a lien, were parted with in contemplation of their being replaced by another security, which did not take effect by the substituted security's proving unavailable, it seems to have been the opinion of the Court of King's Bench that allowance in account might be claimed to the amount of the lien. *Vernon* v. *Hankey*, (2 *T. R.* 119).   So a factor, by parting with the possession of goods, does not forfeit the benefit of his lien when he sells them according to his authority.   For as it would be productive of great inconvenience if a factor could not sell goods committed to him for sale without losing the security he has by the possession of them, it has been determined that the proceeds or securities are subject to the same deductions or lien which the goods in specie were.   *Cowp.* 251; 3 *B. & P.* 449.   These are equitable exceptions to the general rule, and the same principle may be applied to this case.   The plaintiff had the possession of all the documents on which the claim was founded, and, for the convenience of all the parties, he parted with them.   It would, therefore, be unjust that by this act he should be deprived of the lien which he unquestionably would have had if the money had come into his hands.   It may then be viewed as a qualification of the general rule applicable to liens.   Besides, possession need not be actual.   There may be a constructive possession of the thing by the party asserting it, with the express or implied assent of the party against whom it is asserted.   True, a lien is a right to retain a thing, which presupposes a lawful possession, which can arise only from a just possession under the owner or other party against whom the claim exists.   But the possession need not be the actual possession of the party himself; for it is sufficient if the possession be by his servants or agents in the proper discharge of their duty. Neither need the possession always be direct and actual.   It is sufficient if it be constructive and operative in point of law.   Thus when property is at sea, the delivery and endorsement of the bill of lading will confer a constructive possession sufficient to create a lien.   So the delivery of a chose in action or other document or muniment of title, will in many cases give a good lien upon the property represented or intended to be conveyed thereby.   The delivery of a bill of sale of a ship at sea will be a constructive possession sufficient to sustain a lien if the ship is taken possession of within a reasonable time after her return.   So the delivery of a

[Aycinena v. Peries.]

policy of insurance will give a lien thereon : as will the delivery of a promissory note to collect and receive the amount. These principles are supported by numerous authorities, all of which are collected in *Story on Agency* 373, *sect.* 363. If, then, Mr Yard is to be considered as the agent of the plaintiff, having received the money for his use as well as others by virtue of a decree made in his favour and the documents furnished by the plaintiff, and this has been subsequently recognised by all the parties in interest, it gives the plaintiff such a constructive possession of the fund as to sustain a lien in his favour for the amount of the monies advanced by him on their account and the services rendered as their agent. Here I will remark that there is no express agreement, nor is there anything in the transaction which would lead to the opinion that the plaintiff trusted to the personal credit of Mr Yard or the other shippers. Indeed, the whole transaction evinces that such was not the understanding of any one of the parties. They all viewed the proceeds, the fruit of the services rendered by the plaintiff, as the primary fund for the liquidation of his claim. And this is not only according to law, but it is founded on principles of natural justice. It would be unjustifiable in the extreme to give the fund to the shippers, and turn him over to a more than doubtful remedy against an insolvent estate. It would not only be unjust to him, but to the creditors of Mr Yard; for, let it be remarked, that the contest is not between Mr Yard's estate and the plaintiff, but the plaintiff and the shippers, who are endeavouring to obtain the fund without paying the advances made on account of it or for the services by which it was created. And although it may not strictly be a lien, may it not be viewed as a right or charge upon the thing itself? Thus there are liens recognised in equity whose existence is not known or admitted at law. *Gladstone* v. *Birley*, (2 *Meriv.* 403). In regard to these liens, it is true, it may be generally stated that they arise from constructive trusts; they are, therefore, wholly independent of the possession of the thing to which they are attached as a charge or encumbrance; and they can be enforced only in a court of equity. Of this we have a strong illustration in the well-known doctrine of courts of equity, that the vendor of land has a lien on the land for the amount of the purchase money, not only against the vendee himself but also against all subsequent purchasers having notice that the purchase money remains unpaid. In the extent of the lien the vendee becomes a trustee for the vendor; and his heirs and all other persons claiming under them with such notice, are treated as in the same predicament. Indeed, the whole doctrine of implied trusts, of which Mr STORY, in his *Equity Jurisprudence*, page 480, has given numerous instances, has given many examples showing the extent to which a court of equity will go in following the fund and appropriating, upon principles of pure equity, without regard to the technical principles of the common law.

VI. — W

The principles already established evince the inapplicability of the case of *Worrall* v. *Harford*, (8 *Vez.* 4). The indemnity of the trustees under a deed of trust does not give the persons employed by them a right as creditors against the trust fund. Thus persons employed by the plaintiff would not be creditors of the trust fund. That is admitted; but it by no means follows, that because they would not be creditors of the fund, the plaintiff is not, under the peculiar circumstances of this case, entitled to come in in virtue of his equity.

It is said that the equity of the plaintiff is impaired because of the award of Messrs Binney and Sergeant, " that James Yard is to be exclusively responsible for any claim by the Marquis of Aycinena or his representatives for services rendered in the said cases, and for counsel, clerk hire, and translating in aid of the claim before the commissioners." If the Marquis of Aycinena or his representatives had been parties to the submission, there would be great force in the argument. But as they had nothing to do with it, they cannot in any manner be affected by it. Besides, the award only throws upon Mr Yard payment for services, and cannot be made upon any principle of construction to cover a claim for money advanced to effect a compromise, and in payment of legal costs, which, as appears from the verdict, which is special in its character, constitutes three-fourths of the demand.

Nor do I see much force in the objection that the claim has been delayed. It appears that it was known before the final distribution of the fund, and the reason it was not forwarded at a more early date appears from Mr Yard's statement for the arbitrators, 10th May 1825. Mr Yard says: " The charge for the services of the Marquis of Aycinena and his executors is not ascertained, no claim having as yet been preferred from the party in Guatemala : owing probably to the disturbed state of that country, no estimate of the amount that will be called for on this account can be formed; but some estimate may be formed of the extent of the labour and service," &c. He states it resulted in a favourable decision, after seven years of contest, and fixed the rights of the claimants to the fund. And further : " the value of the services rendered by the Marquis Aycinena, &c. cannot be fixed by Mr Yard. He only knows that the ordinary commercial commissions at Guatemala is eight per cent. He only requires that he should be indemnified for the responsibility which the nature of the claim compelled him to assume." And this explains the reason that the arbitrators confined the award to his assumption of responsibility for the services of the Marquis. They could not with any propriety go further; for the amount of his advances, as appears from this statement, was not known.

The award excludes such persons as are not citizens of the United States, and also any sum which is claimed under any person who was not a citizen at the time of the loss. This part of

the award evidently refers to the shippers, some of whom were foreigners, and with no propriety can be construed to extend so far as to exclude the claim of the plaintiff, although a foreigner.

For these reasons we are of the opinion that there was no error in charging the jury that, in point of law, the plaintiff had a right to the fund in the hands of the defendant superior to that of the co-shippers in the Asia and Dolly, or of any other person except the Marquis Vicente de Aycinena.

But it is urged that the plaintiffs, by bringing suit against the personal representatives of Mr Yard, have concluded themselves from proceeding against the fund: but we are not of that opinion. It is true, that Mr Yard was personally answerable to his agents, but an assertion of this right by suit, but without satisfaction, is not inconsistent with a lien or an equitable right to the fund. A factor, as has been held, does not lose his right to a lien on the goods by a suit against the principal for compensation for services rendered as agent. *Story on Agency* 393. We close this part of the subject, in relation to lien by agents, by remarking that the mere fact that an agent has a lien upon the property confided to him, either for his commissions, advances, disbursements or expenses upon that property, or for his general balance of account, does not limit the right of the agent to that mere fund; but the principal is still liable to him personally in a suit *in personam* for the amount of the same claims. For, by the general rule of law, an agent in such cases trusts both to the fund and to the person of his principal. From this it follows that an assertion of one remedy, short of satisfaction, is no abandonment of the other. The agent may resort to one or both remedies, as he may think expedient and proper. For this many authorities are cited by the commentator, which abundantly support the text. The books are full of cases where a party has two securities, one *in rem*, the other *in personam*, as, for example, a mortgage accompanied, as it usually is, with a bond. It has never yet been supposed that by suit on the bond you impaired your right to your real security. Indeed, in some cases, it is convenient at least to ascertain the amount due by suit before you attempt the subject, the fund, which may be an ancillary security for the debt. The cases cited by the defendant do not apply, for those, as in *Merrick's Estate*, are cases which depend on the doctrine of election. Undoubtedly, a principal may elect to consider one of two persons his debtor, and by suit against one may lose all remedy against the other.

The court is further of the opinion that the accounts of the defendant, as administrator of Yard, including the accounts of the whole of the fund, having been filed in the Orphan's Court and being now before an auditor, affords no defence in the case, notwithstanding the plaintiffs' counsel appeared and took part before the auditor and had the defendant under examination in relation to the accounts of this fund. The Orphan's Court have no juris-

diction over the fund, as it has been already shown that it forms no part of the estate of Mr Yard, being always kept separate and distinct from his property by him, his executrix and Mr Peries. Whether we consider the several persons who had the custody of the fund as trustees or stakeholders, they cannot in that character be amenable to the jurisdiction of that court, who have power to settle the estate of the testator, and nothing more. This fund belonging to others and not to him, it would be contrary to every principle of right to blend it with his property for the benefit of creditors of his estate. That counsel appeared before the auditor and examined the defendant in relation to the fund, amounts to nothing. From the course which had been lately adopted, this became necessary, and they may have thought themselves compelled to appear to protect their rights by protesting against the intended use of the fund.

Under this head the counsel for the shippers, who have been permitted to appear and defend their interest, have started another objection, which is equally untenable. They contend that the defendant is a trustee, and that no suit can be sustained until after he has settled an account. For this position they rely on *Gray* v. *Bell*, (4 *Watts* 410); *Rush* v. *Good*, (14 *Serg. & Rawle* 231), and *Vanarsdale* v. *Richards*, (1 *Whart.* 408). True, the assignees under a voluntary assignment are not liable in an action for money had and received before an account has been settled and decree made by the Court of Common Pleas. But this is not an assignment, and I know of no law which gives jurisdiction to the Court of Common Pleas to compel the settlement of an account in a case like the present. It is a mistake to suppose that Mr Peries is a trustee within the meaning of the Acts in relation to this subject. He received the money, and has it now in his custody for the benefit of all who may be interested in its distribution, but he can in no sense be considered a trustee but as a stakeholder or recipient of the money for the use of the shippers and others. And this, I think, will clearly appear from the history of the transaction already given.

And, considering the defendant in the light of a stakeholder, all difficulty whatever in sustaining an action for money had and received is removed, except what arises from the unsatisfied claim of the Marquis of Aycinena, who has an equal right with the plaintiff to participate in the fund. And this consequence necessarily follows from the proposition which it has been the object of the preceding remarks to establish, that the plaintiff's right to the fund in the hands of the defendant was superior to that of the co-shippers by the Asia and the Dolly or of any other person except the Marquis Vicente de Aycinena. It is true, that in order to support an action for money had and received, at common law, a privity of contract must exist between the plaintiff and defendant, and a consideration either express or implied. The defendant, standing

in a fiduciary character, with money in his hands belonging to the plaintiff, there was both privity of contract and sufficient considera-tion to support *assumpsit.* But this case, at the trial, was not rested on common law, but equitable principles, and hence a special judgment was entered. Justice may have been had on the equity side of the court, and perhaps that would have been the best mode of attaining it. But, be this as it may, it does not follow that in Pennsylvania the remedy may not be had in a common law action. Although frauds, accounts and trusts are proper objects of a court of equity, it is by no means true they are exclusively cognizable therein. On the contrary, fraud is, in many cases, cognizable in a court of law; and sometimes a fraud in obtaining a will or devise of land is exclusively cognizable there. Many cases of accidents are remediable at law, such as loss of deeds, mistakes in accounts and receipts, impossibilities in the strict performance of conditions, and other like cases. And even trusts, though in general of a peculiar and exclusive jurisdiction in equity, are sometimes cog-nizable at law; as, for instance, cases of bailment, and that large class of cases where the action for money had and received for another's use is maintained *ex æquo et bono.* 3 *Black. Com.* 431, 432; 1 *Wood. Lectures* 208, 209; 1 *Story's Equity* 96, *sect.* 60. In conferring on the court chancery powers, it does not oust the jurisdiction of the common law courts; for if it were so, there would be an end to the equitable action of ejectment, or other like remedies, where we have always administered equity through the instrumentality of common law forms. If the Legislature intended so great a change in the law, they would have expressed their meaning in clear and unambiguous terms. We cannot infer such an intention from the grant of additional equity powers. In some parts of the State, the courts are not clothed with equity powers to the same extent, from which it would follow, if we adopt the views of the defendant's counsel, one remedy would be good in one county, and a different rule would prevail in another. We therefore perceive no obstacle in the way of the plaintiff from the concession that he may have relief on the equity side of the court. They are concurrent remedies, either of which he may pursue at his election.

The question, therefore, recurs, whether he is entitled to relief in this form of action. This suit was considered at the trial as in the nature of a bill in chancery with the great object of getting the possession of the fund and bringing it under the supervision and control of the court. A special judgment was rendered; and in case judgment should be finally rendered for the plaintiff, then the plaintiff was to be at liberty to issue execution or process in nature thereof. The execution is to be issued subject to the right of the Marquis of Aycinena, under the direction of the court. The verdict and judgment give the court the entire control of the process, and the money arising from it; they will then take care

[Aycinena v. Peries.]

to distribute it among all persons who may have any interest in it. After the case of *Martzell* v. *Stauffer*, (3 *P. R.* 398), where this question was attentively considered and the peculiar law of Pennsylvania on this subject examined, we think the power of the court to give equitable relief in the action for money had and received cannot be questioned. It was put on the impregnable ground that without this power in the court justice could not be done, and that there would be a wrong without a remedy. The court pointed out the mode of administering relief by placing the money at the disposal of the court, by controlling the process by an order endorsed on the execution directing the sheriff to bring the money into court, or by a special judgment, which was the mode adopted here. This, we conceive, gives us the entire control of the fund, which we will take care to distribute upon the equitable principles which have been already intimated. It is proper to remark, that whether the defendant's claim for his services may be determined in this case is still open for investigation.

Judgment affirmed.