# Church and Wife *versus* Ruland and Wife.

1. The Acts of Assembly giving the courts separate equity powers, do not divest them of any part of their previous jurisdiction to afford the same relief through common-law forms.

2. Equity is still a part of the law of Pennsylvania.

3. Specific performance of a contract for the sale of land or a trust in regard to it, may be enforced by ejectment.

4. The judge is the chancellor assisted by a jury.

5. The judge as chancellor must be satisfied; and what goes to the jury is to determine the credibility of the witnesses, and to weigh and decide on conflicting testimony.

6. It is not as in other trials, when any evidence reasonably tending to prove a fact is to be submitted to the jury.

7. If the evidence is too vague, uncertain or doubtful to establish the equity set up, it is the duty of the judge to withdraw it from the jury.

8. A trust *ex maleficio* is not within the Statute of Frauds, as adopted in Pennsylvania by the 4th section of Act of April 22d 1856.

9. A trust *ex maleficio* may arise under a will.

10. Enforcing such trust gives full effect to the will, but fastens upon the conscience of the party having procured the will on a promise, a trust which equity will enforce.

11. If one with notice of a trust, purchase from another without notice, the former can shelter himself under the bonâ fide of the latter.

12. If the second purchaser in such case be the original trustee, he merely acquires his former estate and is fixed with the trust.

13. A devise was to one absolutely under a promise, that after her death the property should go to others specified. The limitation in the 6th section of Act of April 22d 1856 did not run during her life.

14. The fraud under which the trust arose was not consummate until the devisee's death without making a will in favor of those for whom she promised.

15. Hoge *v.* Hoge, 1 Watts 163, Jones *v.* McKee, 6 Barr 425, recognised.

March 14th 1870. Before THOMPSON, C. J., AGNEW and SHARSWOOD, JJ. READ, J., at Nisi Prius.

Error to the Court of Common Pleas of *Luzerne county:* Of January Term 1870.

This was an action of ejectment, brought the 26th of July 1867 by Abraham Ruland and Letty Ruland his wife in her right, against Joseph Church and Charlotte Church. The premises claimed in the writ were an undivided sixteenth part of a piece of land in the city of Scranton, containing 40 acres. The premises had originally been the property of Thomas Griffin, who, by his

[Church *v.* Ruland.]

will, dated March 27th 1852, and proved April 3d 1854, devised them to his daughter Letta, adding to the devising clause, "The said daughter Letta is to have the said lands, &c., in fee simple for ever, without any entailment whatever." Letta Griffin, the devisee, by her will, dated September 22d 1862, and proved April 24th 1867, gave legacies to the children of her sister Charlotte, amongst whom was Mrs. Ruland, the plaintiff, to whom she gave $100. She disposed of the residue of her estate as follows:—

"It is my will and wish that Charlotte Church, the youngest daughter of my said sister Charlotte, should have the residue of all my property, real, personal and mixed; and I do give and bequeath the same to her, subject to the payment of the foregoing bequests and debts."

The residuary devisee was the defendant in this case. The sister Charlotte's married name was Stevens. The plaintiffs alleged that Thomas Griffin had devised the 40 acres to his daughter Letta, at her solicitation and on her pledge; that after her death the one-half should go to the children of her sister Charlotte.

The cause was tried, November 15th 1869, before Conyngham, P. J.

Thomas Griffin, a brother of Letta Griffin, the last devisor, testified that in 1853, Letta and her father being together, the father "said Letta had prevailed on him, that he did not put it into the will, and said that he wanted to make another will. Then Letta said, Father, I will do just as I have agreed with you. Then father replied, I am afraid you won't do it. Then Letta says, Father, I will do just as you have said about the property. Then father said, Now we will call you for a witness. Now the one-half of this tract of land you can have in trust for your lifetime, and at your death, you see, it is equally divided among Charlotte's children. Yes, Letta says, I will do so. Then father says, Now, Tom, I want you to remember this. That was all that was said. They were talking about the land he had willed to Letta; was the same land. He called me as a witness for the will to remain as it was, and the Stevens heirs to have one-half of the land at her death. He said Letta had persuaded him not to put this in the will for the Stevens children, and she would do it." The witness further testified that the father said frequently after this, in the presence of Letta, that Charlotte's children were to have one-half of the land, and that since his death Letta had often told him that she held one-half the land in trust for her sister Charlotte's children.

Henry Griffin, a nephew of old Mr. Griffin, testified "that he went to see him about 1852 or 1853; the old gentleman went out of the house. Letta then says, We have been having a pretty hot time here for a while. Says I, What is up? She says, I have got father to change his will; that she told him she would not keep

14 P. F. SMITH—28

[Church *v.* Ruland.]

house for him; she would not stand it unless he had his will changed; she had got·it now changed about as she wanted it; she had got her brother Ben out of the will as one of the executors, and Randall in his place.   Then she went on to say that she had prevailed on her father to will Lotty's right to her for her use during her life, and her father was very much dissatisfied about it, and he would be in pretty soon, and something would be said about it.   About that time it appeared he had been at the door and overheard some of it; he came in and was pretty angry. Walked the floor, stamped his cane, and said he wouldn't stand it; said it was not his will; it is Letta's will.   Then Letta said, I'll leave it to Henry, and let me tell my story.   She then went on and told what trouble she had had in bringing up that child Lotty Church.   Spoke of restless nights and trouble, and she thought she ought for this to have her sister's share during her life. * *   Uncle Tom said he wanted them to have it after his death; they never had anything, and he wanted them to have it. He says, I am afraid, Henry, she won't do it.   I says, Yes, Uncle Tom, she will; she has told me so to-day that she would do it. Then, says he, Henry, I want you to see that it is done.   I said I didn't know but that I should be dead.   Said he didn't like it the way it was; said he didn't want it that way, as it would give the chance for a lawsuit; that he would not then disturb the will; would leave it alone for awhile and think of it.   That was about all.   Some months after that I stopped to see her again, and he began to talk about it in Letta's presence.   She says, Now, father, Henry knows all about it; you must be crazy; he says, I know that.   She says, Didn't you talk it over with Thomas and Ferdinand Van Storch, a few days ago, and call them up as witnesses to the agreement we had made concerning the will of this property?   He said, That is just what I am coming at.   Now, says he, Letta is to have the use of this property; one-half of it don't belong to her; one-half is hers to have the use of it during her life, and then the one-half is to go to the Stevens heirs.   She said she was going to give it all to them.   He says, Maybe not in the way I want to give it; maybe you may give it all to one or two of them, as you may like.   She said she would give it to all of them.   He said he wanted it understood that one-half she had nothing to do with; it must be equally awarded among them; that with the other part she might do what she pleased.   She might give it in the family or out of the family; didn't care what she did with it.   She said she would do as she had agreed, and Thomas and Ferdinand Van Storch called as witnesses."

Sarah A. Heermans testified :—

" After the death of Uncle Thomas Griffin, I had conversations with Letta frequently about her father's will.   She said that she and her father had an understanding that the portion belong-

[Church v. Ruland.]

ing to the heirs of Charlotte should remain in Letta's hands until Letta's death, and then go to Charlotte's children.   Charlotte Church and Letta, talking about the heirs and the will in my presence, said that the Stevens heirs were dissatisfied; that she had heard that they threatened to break the will of her father Thomas.   She said that they must wait; that they would have their mother's portion when she was done with it.   She had promised her father that at her death she would secure to the heirs of Charlotte Stevens the portion that belonged to their mother.   The same conversation was frequently talked over in the presence of Charlotte Church and Letta Griffin.   Some of these conversations took place after Charlotte married Church, in the presence of Charlotte Church."

McKiel Stevens testified:—

"Old Thomas Griffin was my grandfather.   My mother's name was Charlotte; she has been dead about 28 years, perhaps 30 years.   I have a suit for my portion of this land.   I had conversations with my aunt Letta; the first conversation soon after grandfather's death; was in the same spring.   She said, that grandfather had left one portion to her for her lifetime, and then was to be given up to us.   On another occasion she told me she had been offered $300 or $350 per acre for it, and wanted to know if I thought she had better sell it for that. * * * On the next occasion she told me she had sold it for $500 per acre to Edmund Griffin.   The next conversation I remember, I received a letter from her, and went to see her.   Edmund Griffin had failed to make payments, and he had threatened to keep her out of her property during her lifetime, and wanted I should take hold of it and try to get the property back into her hands.   She said she had given up the bond to him, and only held the mortgage, and wanted me to come to Wilkesbarre, and see Lawyer Dana, her counsel, as to what could be done.   She said, Do not leave a stone unturned; the property belongs to you children; it was left to me by your grandfather for you children.   I came to Wilkesbarre and saw Lawyer Dana.   Some time elapsed and she sent for me again, and wanted me to come to Wilkesbarre.   Said she wanted me to work as if working for myself, for the property belongs to you heirs.   She said if she got the property back into her hands she would sell it again, if I thought best, for $500 per acre.   She would have the payments so made that out of the first payment she would try to have it so she could let the heirs have $500 each, and that as the payments fell due she would divide it among them with the exception of what she wanted for her own use.   She never said to me that she had used any influence with her father to make the will.   Church soon after married into the family."

Durlin Griffin testified :—

[Church *v.* Ruland.]

"I am son of Thomas Griffiin the elder. Was present at conversation between father and sister Letta about this property in the latter part of August 1853. Ferdinand Van Storch was called as a witness between my father and sister Letta. My father appeared agitated. He spoke to Ferdinand, and said, I am glad you are come; I am going to make another will. This brought my sister Letta to the door. Then she spoke and said, father thinks all the time I would not give Lotty's children their mother's property. Then she called Ferdinand Van Storch for a witness. Then father spoke: Letta is to have one-half of this property, or her children and I want you to remember this; the children are to have it at Letta's death."

Charlotte West testified:—

"I am no relative to these parties. Letta came into my house, shortly after her father's death, and said her father had willed her 40 acres of land, and the house. She said, The half of it belongs to my sister; she mentioned her portion. I promised father, when he made his will, that the half of his property should be divided amongst my sister's children, as she never had anything, and she said, I can do with my half as I please."

The other children of Charlotte Stevens testified that Letta had declared to them that under the arrangement with her father, they, the children of Charlotte were to have one-half the property on Letta's death. There was other testimony also of the same character.

The defendants gave in evidence, a deed dated August 19th 1856, from Letta Griffin to Edmund Griffin for 19 acres, part of the 40 acres; judgment in her favor against Edmund and sale to her by the sheriff of the same land. They gave evidence of the instructions given by Thomas Griffin as to drawing his will, in which nothing was said about Letta's agreement, and in which he told his counsel specifically to insert the clause which declared she should have the land "without any entailment."

There was much other evidence on the part of the defendants for the purpose of showing that there was no arrangement such as would affect Letta with a trust.

A number of points were submitted by each of the parties:

By plaintiffs, amongst others:—

5. If Letta Griffin, at the time she made a conveyance of a part of the land in dispute to Edmund Griffin, held the undivided one-half part of that land in trust for the heirs of Charlotte Stevens, deceased, coupled with a power to sell the same, and on such sale received from Edmund Griffin part of the purchase-money, and had the balance of the purchase-money secured by bond and mortgage on the land; and afterwards Edmund Griffin failed to pay the balance of the purchase-money so secured, and she obtained judgment against him on said bond, and upon said judgment sold

[Church v. Ruland.]

the land at sheriff's sale, and at such sale bid the same in for a sum less than the debt upon which it was sold, and had the deed made in her own name, she cannot hold the undivided one-half part of the land that she held in trust for the heirs of Charlotte Stevens, deceased, against their will; but a resulting trust is raised in favor of the said heirs, and Letta Griffin thereupon held the undivided one-half part of said land in trust for the heirs of the said Charlotte Stevens, deceased.

6. If Letta Griffin was a trustee before her sale to Edmund Griffin, and she made the sale to him, taking a bond and mortgage for part of the purchase-money, upon which by suit and judicial sale the land came back to her, she still remained a trustee, and the right of the Stevens heirs would not be divested by reason of such sale; *a fortiori* is this the case if she consulted with the Stevens heirs in relation to such sale, promising to divide the proceeds when received.

The defendants' 5th and 6th points were:—

5. If a trust existed by operation of law in Letta Griffin, at any time, and she with the knowledge, acquiescence and consent of the plaintiffs sold the land, or any part thereof, to Edmund Griffin in fee simple, which was afterwards sold at judicial sale, purchased by Letta Griffin, and conveyed to her by sheriff's deed, she takes under it discharged of the trust.

6. That the will of Thomas Griffin, having been duly admitted to probate, and more than two years having elapsed since the 1st day of October 1856, without the plaintiffs having brought their action, and duly pursued it to recover the land in controversy, it is conclusive as to such realty, and the plaintiffs cannot recover.

The other points related to the question of the creation of the trust.

The court affirmed the plaintiffs' 5th and 6th points, and refused the defendants' 5th and 6th points.

After referring to the evidence and stating the principles of law applicable to the question of parol trusts, Judge Conyngham said:—

" Where an estate is invested in another by will, as in this case, and at the time of the creation of the estate the devise is agreed to be received, and is accepted for the use of another person, either immediately or to commence at a future time, by the agreement and understanding of the parties, the person from whom the estate is to pass, and the one in whom it is to vest, as here Thomas Griffin the elder and his daughter Letta, a valid trust for such other person will be supported and recognised in law, even though it is all dependent upon parol or verbal testimony."

He further referred to the evidence in connection with the law, and concluded :—

" In all cases of claimed parol trusts, the whole evidence must

[Church *v.* Ruland.]

be carefully examined and fully weighed and considered, and the alleged facts must be satisfactorily established in the judgment of the jury, before they can be allowed. It does not depend upon what a jury may think ought to have been done by the grandfather, under the circumstances mentioned, for the benefit of his grandchildren, but what did he do, or what did he leave undone, that he desired to do? By the will in writing, in plain and clear language, he gave the entire fee simple of the property to his daughter Letta, and she and those claiming under her, have the right to ask the court and jury so to hold and decide, unless under the principles already stated, the jury find such a state of the facts fully and clearly proved, as to establish a trust for the one moiety of the trust for the Stevens heirs, as heretofore explained to you.

"The case, under these rulings, presents a question of fact for you; you are to judge of the credibility of witnesses, whether they are to be believed or not, whether mistaken or not, and what was the true understanding, in fact agreement, if any, between Letta Griffin and her father as to this property. We have carefully explained to you, what would be necessary in order to establish a valid trust, which can be enforced in this suit."

The verdict was for the plaintiffs.

The defendants removed the case to the Supreme Court, and there assigned fifteen errors. The 9th assignment was to the refusal of the defendant's 6th point.

The 14th was to the affirmance of the plaintiffs' 5th and 6th points and the refusal of the defendants' 5th point.

The others related to the charge of the court on the question of the parol trusts, and are sufficiently indicated in the opinion of the Supreme Court.

*Lamberton, Winton* and *Kulp*, for plaintiffs in error.—Edmund Griffin took the land without notice, and therefore clear of the trust: Scott *v.* Gallagher, 14 S. & R. 333; Peebles *v.* Reading, 8 Id. 495. The purchaser of his title at a judicial sale takes it in the same way: Bracken *v.* Miller, 4 W. & S. 102; Act of June 16th 1836, § 66, Pamph. L. 773, Purd. 443, pl. 78; Arnold *v.* Gore, 1 Rawle 227. The claim should have been pursued within a reasonable time: Prevost *v.* Gratz, 1 P. C. C. Rep. 373; Leisenring *v.* Black, 5 Watts 304. Parol declaration of trust must be contemporaneous with the act: Edwards *v.* Edwards, 3 Wright 378; Rearick *v.* Rearick, 3 Harris 66; Lingenfelter *v.* Ritchey, 8 P. F. Smith 488; Irvin *v.* Irvin, 10 Casey 525; Hoshauer *v.* Hoshauer, 2 Id. 407. The court should reject all evidence of trust against the legal title which would not induce a chancellor to decree a conveyance: McBarin *v.* Glass, 13 Wright 162; Emerick *v.* Emerick, 3 Phila. R. 94. The subject of the trust was not specific as in Hoge *v.* Hoge, 1 Watts 63; Jones *v.*

[Church *v.* Ruland.]

McKee, 3 Barr 96. The probate of a will is conclusive as to real estate after five years: Act of April 22d 1856, § 7, Purd 275, pl. 13; Kenyon *v.* Stewart, 8 Wright 180; Kenyon *v.* Ashbridge, 11 Casey 157. The trust was not executed within five years: Act of 1856, *supra*, § 6, Purd. 655, pl. 13. The conveyance, although in Letta's lifetime was a disaffirmance of the trust and should have been pursued within the time limited by law: Lyle *v.* Richards, 9 S. & R. 449; Williams on Real Prop., 27 Co. Litt. 362. The probate of Thomas Griffin's will has become conclusive: Spangler *v.* Rambler, 4 S. & R. 193; Smith *v.* Bursall, 5 Rawle 86.; Rowland *v.* Evans, 6 Barr 441; Allen *v.* Dundas, 3 T. R. 130; Archer *v.* Morse, 2 Vern. 8 & 9; Bacon Abr. title *Wills*; Thompson *v.* Thompson, 9 Barr 234; Barker *v.* McFerran, 2 Casey 213; Holliday *v.* Ward, 2 Harris 490; 1 Williams on Ex., § 450; Warfield *v.* Fox, 3 P. F. Smith 384; 1 Jarman on Wills 21, note; Gable *v.* Daub, 4 Wright 217.

*W. G. Ward, A. Hand* and *Wright & Harrington*, for defendants in error.—Although a will has been conclusively established by the probate, it may be affected with a trust: 1 Williams on Exrs. 341, 342; 1 Jarman on Wills 22 and note, 23; Gawler *v.* Slanderwick, 2 Cox 16; Barrow *v.* Greenough, 3 Vesey 152; Bym *v.* Godley, 4 Id. 11; Strickland *v.* Aldridge, 9 Id. 516; 1 Story's Eq. Jur., § 256, note 1–4; Porter *v.* Mayfield, 9 Harris 264; Irons *v.* Burns, 6 P. F. Smith 301.

Parol evidence is admissible to charge a trust upon an executor or a devisee who has prevented the testator from making provision in his will by expressly and verbally undertaking with the testator to fulfil his wishes in that respect, or by fraudulently inducing him to make a new will without such provision: 3 Greenl. Ev. § 365; 1 Story's Eq. Jur. §§ 252, 256; 2 Id. § 781; 3 Woodeson's Lectures 261; 4 Kent's Com. 305 and note *a*; 2 Crabb on Real Property 1768 and notes; Ward on Legacies 14, 15; Powell on Devises 512, 513 and notes; Lewin on Trusts 38, 39; Law of Trusts, &c., by Tiffany & Ballard 189 *et seq.*; 1 Jarman on Wills 350; Chit. on Contracts 56; Addison on Contracts 844; 2 Washburn on Real Property 178; Mestear *v.* Gillespie, 11 Ves. 638; Thompson *v.* White, 1 Dall. 447; German *v.* Gabbald, 3 Binn. 302; Drum *v.* Simpson, 6 Id. 478; Slaymaker *v.* St. John, 5 Watts 30; Hoge *v.* Hoge, 1 Id. 162; Sheriff *v.* Neal, 6 Id. 541; Miller *v.* Peirce, 6 W. & S. 100; Rearick *v.* Swineheart, 1 Jones 240; Jones *v.* McKee, 3 Barr 496; McKee *v.* Jones, 6 Id. 427; Lloyd *v.* Carter, 5 Harris 220; Williard *v.* Williard, 6 P. F. Smith 124.

If Letta Griffin sold wrongfully, she bought back charged with the trust if the heirs of C. Stevens so elected, and they can claim

the benefits of her repurchase: Law of Trusts by Ballard & Tiffany 555; Noel *v.* White, 1 Wright 523.

The sale of real estate and securing of balance of purchase-money by a mortgage form one transaction, and a sale upon a judgment recovered upon a bond accompanying the mortgage, where the vendor is the purchaser, places the parties in their original position: Chew *v.* Mather, 1 Penna. R. 474; Episcopal Academy *v.* Frieze, 2 Id. 16; Love *v.* Jones, 4 Id. 465; Horbach *v.* Riley, 7 Barr 81; Kerr *v.* Stiffey, 2 Penna. R. 176. The cestui que trust may follow the trust-money into land purchased with it by the trustee: 3 Washburn on Real Property 187, § 47; Kilpatrick *v.* McDonald, 1 Jones 393.

*Woodward,* for plaintiff in error, in reply.—Ejectment has been sustained in Pennsylvania to enforce the execution of a parol trust, on the principle that equity considers that done which ought to be done. But by various Acts of Assembly since 1836, full chancery powers have been conferred on our courts and suitable forms of procedure prescribed. By Act of March 21st 1806, Purd. 41, where a remedy is provided or duty enjoined, &c., by an Act of Assembly, the act must be strictly pursued. Our equitable ejectment should be considered as taken away by the statutes conferring the chancery powers.

The enforcing of this trust would repeal Thomas Griffin's will. His will cannot be repealed; nor "any devise or direction altered," but by some other will, &c., Act of April 8th 1833, § 13, Purd. 1017. Further, Letta's title is confirmed by the acts of ownership exercised by her, for many years in sight of the cestuis que trust, who, if they could not have taken possession during her life, could have had relief in equity: Hill on Trustees 168; Smith *v.* Clay, Bro. C. C. 639; Beckford *v.* Wade, 17 Vesey 97. The Act of 22d April 1856, *supra,* 4 and 7 sections, bars the plaintiffs.

The heirs of Charlotte Stevens were bound to come in within two years after this act, to impeach Thomas Griffin's will. The trust must under the act be manifested in writing. The proof of what took place at the time the will was made is contrary to the trust, instead of for it. If an agreement was made afterwards, it is *nudum pactum*—it is opposed to the policy and letter of the statutes, and is not within any of the modes in which a resulting trust can arise, viz., a purchase is in the name of another; where there is a voluntary conveyance with no trust declared, and where the conveyance is on trusts which are not declared; or are only partially declared or fail. The testator must sufficiently express his intention that the donee should take only in trust for others: Meredith *v.* Heneage, 1 Sim. 555; Wood *v.* Cox, 2 M. & Cr. 692. A trust is never presumed except in case of absolute necessity:

[Church v. Ruland.]

Cook v. Fountain, 3 Swanst. 585; Padmore v. Gunning, 7 Sim. 644; Porter v. Mayfield, 9 Harris 263; Barnet v. Dougherty, 8 Casey 371; Bennett v. Fulmer, 13 Wright 155; McBarron v. Glass, 6 Casey 133.

It is submitted that the most thorough examination of the authorities will establish these two propositions as the very mind of the law :—

1. Before the Statute of Wills, 1 Vict. c. 26, § 9, chancellors treated resulting trusts upon the Statute of Frauds, 29 Car. 2, holding that a statute to *prevent* frauds must not become an instrument of fraud, they admitted parol evidence freely to discover the real intention of the testator, and thus to give his will the very effect he intended it should have.

2. But since the Statute of Wills, both in England and this country, the field of parol evidence has been greatly narrowed, and is continually narrowing. A testamentary trust, to be made out by parol, must have its root in the will. The instrument, construed by its four corners, must betray the intention of the testator that his donee was to take a qualified interest—something less than an absolute estate.

The opinion of the court was delivered, March 24th 1870, by

SHARSWOOD, J.—It cannot be maintained, at this late day, that the effect of investing the courts with separate equity powers, to be exercised according to the mode of proceeding in use in the English Court of Chancery, was to divest them of any part of the jurisdiction before possessed by them to afford the same relief through common-law forms. Equity is still as much a part of the law of Pennsylvania as it was in 1787, when Chief Justice McKean so declared it to be in Pollard v. Shaafer, 1 Dall. 210; Lehr v. Beaver, 8 W. & S. 106. The action of ejectment may still be employed as a remedy to compel the specific performance of a contract for the sale of land, or to enforce a trust in regard to it. Every volume of reports since 1836 abounds with the evidence of this in the determination of numerous cases in which it has been silently assumed. Besides, it was expressly so decided in Aycinena v. Peries, 6 W. & S. 257, Biddle v. Moore, 3 Barr 161, and Corson v. Mulvany, 13 Wright 88, so that if any point is ever to be considered completely at rest, it is this. Nor is such an administration of equity justly open to the reproaches cast upon it in the oral argument of this case. It is not the substitution of twelve unlearned chancellors for a lawyer prepared for his office by the lucubrations of twenty years. The judge in reality is the chancellor with the assistance of a jury. It is not like other ordinary trials at law, where any evidence reasonably tending to prove a fact, must be submitted to be passed upon by that tribunal. The conscience of the judge as chancellor must be satis-

[Church & Ruland.]

fied, and what goes to the jury is to determine the credibility of the witnesses, and to weigh and decide upon the force and effect of conflicting testimony. What is this but the trial of a feigned issue out of chancery? If the evidence is too vague, uncertain or doubtful to establish the equity set up, even if believed, it is the duty of the judge to withdraw it from the jury either by a nonsuit or a binding direction in his charge, as the case may require: McBarron *v.* Glass, 6 Casey 133; Todd *v.* Campbell, 8 Id. 252; Bennett *v.* Fulmer, 13 Wright 162; Miller *v.* Hartle, 3 P. F. Smith 111.

The assignments of error, fifteen in number, need not be separately considered. The statement of a few well settled principles and rules of decision disposes of them all.

That a trust *ex maleficio* is not within the prohibition contained in the 7th section of the Statute of Frauds and Perjuries, 29 Car. 2, c. 3, which was adopted and enacted in this state by the 4th section of the Act of April 22d 1856, Pamph. L. 533, has been the uniform doctrine of the English courts: Hill on Trustees 59, and the cases there cited, to which may be added Plumer *v.* Reed, 2 Wright 46; Beegle *v.* Wentz, 5 P. F. Smith 369, decided by this court since the passage of the Act. Indeed it is not easy to see how such a trust ever could be made out except by parol evidence, and if this is not competent a statute made to prevent frauds would become a most potent instrument whereby to give them success. That this doctrine is applied to cases arising under wills where a person procures a devise to be made in his favor on the distinct declaration or promise that he will hold the land in trust either in whole or in part for another may be seen in the cases referred to in 1 Jarman 356; 1 Story's Equity, § 256. It is not affected by the statutory provisions on the subject of wills. The proof offered is not of any alteration, revocation or cancellation, which must be evidenced in a particular manner. It gives full effect to the will and every word of it, and to the conclusiveness of the probate, where it is conclusive. It fastens upon the conscience of the party, having thus procured a will, and then fraudulently refusing or neglecting to fulfil the promise on the faith of which it was executed, a trust or confidence, which a court of equity will enforce by compelling a conveyance when the proper time for it has arrived; and with us in Pennsylvania such a conveyance will be considered as having actually been made, whenever it ought to have been made. The cestui que trust will be entitled to recover in ejectment against the trustee, and all in privity with him. This was decided in Hoge *v.* Hoge, 1 Watts 163, a case fully and ably argued and considered, both by the counsel engaged in the cause and by the court, as appears in the elaborate opinion by Chief Justice Gibson. It was there held that if a testator be induced to make a devise, by the promise of the de-

[Church v. Ruland.]

visee that it should be applied to the benefit of another, a trust is thereby created which may be established by parol evidence ; and, that this is not contrary to the Statute of Wills.   "It is contended,' said Gibson, C. J., "that parol evidence of a trust is contrary to our Statute of Wills, which corresponds as far as regards the point in dispute, with the British Statute of Frauds.   Undoubtedly every part of a will must be in writing ; and a naked parol declaration of trust in respect of land devised, is void.   The trust insisted on here, however, owes its validity, not to the will or the declaration of the testator, but to the fraud of the devisee.   It belongs to a class in which the trust arises *ex maleficio*, and in which equity turns the fraudulent procurer of the legal title into a trustee to get at him ; and there is nothing in reason or authority to forbid the raising of such a trust, from the surreptitious procurement of a devise."   To the same effect is Jones v. McKee, 3 Barr 496, s. c. 6 Barr 425, a case the same in principle and very similar in its facts to that presented upon this record.

Was there then given on the trial in the court below such evidence of the procurement of the devise of the land in question upon a promise to hold in part for the benefit of the plaintiffs as ought to induce a chancellor to decree the enforcement of a trust ? If there was, the case was properly submitted to the jury.   Three witnesses, entirely disinterested and occupying the same relation to both parties, testified to conversations between the testator, Thomas Griffin, and his daughter Letta, the devisee named in the will, very soon after its execution.   Thomas Griffin asserted and his daughter did not deny but admitted that he had made the devise of the whole tract to her alone in fee, by her persuasion, and under her solemn promise that on her death one-half of it should go to the children of her sister Charlotte Stevens.   He required her to reiterate this promise in the presence of witnesses.   Another disinterested witness testified that on one occasion she heard him, in Letta's presence, state that it had been agreed between them that the heirs of her sister Charlotte should have their mother's portion after her death.   This is something very different from the mere parol declarations by a testator of what he intended. It was as strong as if witnesses had been produced present at the agreement before the execution of the will.   Several other witnesses testified to Letta's admissions at different times that one-half of the land at her death was to belong to her sister's children. Her acts and declarations when she made a contract of sale of the land were strongly corroborative of the same thing.   She consulted her nephews, and according to the testimony of one of them, McKiel Stevens, told him she would have the payments so arranged that out of the first instalment she could let the heirs have $500 each, and that as the payments fell due she would divide it among them, with the exception of what she wanted for her own

use.   That Thomas Griffin at other times stated that he wanted Letta to remember Charlotte's children, when she was done with the property, or that she should remember the Stevens' children if she had anything left, did not materially weaken the force of the direct evidence before adduced.   Nor did the fact that he did not communicate the agreement to his counsel when he drew the will, though it was certainly a circumstance to be weighed by the jury, necessarily contradict or impeach the testimony of the witnesses as to the agreement admitted by Letta to have been made before the will was drawn.   Indeed even regarding the evidence to be inconclusive of the existence of such prior agreement, the testimony of Durlin Griffin, if believed, would establish the trust; for he stated that Thomas Griffin said to Van Storch, who was called in as a witness that he was going to make another will, but that Letta by her promise made at that time prevented him from doing so.   There was then sufficient evidence, if believed, to establish the trust.

It is supposed, however, and one of the assignments of error rests on that basis, that Letta, the devisee, could claim as a bonâ fide purchaser under her vendor, Edmund Griffin, who does not appear to have had notice of the trust.   Undoubtedly if a person, though with notice, purchases from one without notice, he is entitled to stand in his shoes, and take shelter under his bona fides.   If it were not so the bonâ fide purchaser without notice might be unable to dispose of the property, and thus its value in his hands be materially deteriorated.   But if the second purchaser in such case be the original trustee, who reacquires the estate, he will be fixed with the trust : Hill on Trustees 165.   If an express authority for so plain a position be needed it will be found in Kennedy *v.* Daly, 1 Schoale & Lefroy 379.

Nor is the plea of the limitation contained in the 6th section of the Act of April 22d 1856, Pamph. L. 533, of any avail.   That section provides " that no right of entry shall accrue or action be maintained * * * * to enforce any implied or resulting trust as to realty, but within five years after * * * * such equity or trust accrued, with the right of entry."   During the life of Letta, the devisee, the trust did not accrue.   The fraud from which it arose was not consummate until her death without having made a will in favor of the children of Charlotte Stevens.   Until then no action could have been maintained : Price's Appeal, 4 P. F. Smith 472.

Judgment affirmed.