# MARCH, 1930.

WILLIAM M. BINSWANGER, ADMR., ETC., RESPONDENT, v. THE EMPLOYERS LIABILITY ASSURANCE CORPORATION, LTD., APPELLANT.

Kansas City Court of Appeals. April 7, 1930.

1026

*Silverman & Strop* for respondent.

*Brown, Douglas & Brown* for appellant.

BLAND, J.—This is an appeal by defendant from a decree reforming on the ground of a mutual mistake, a policy of indemnity insurance, so as to name therein as the assured the Fleeman-McNeill Funeral Home, a corporation, instead of John N. McNeill and William J. Fleeman, operating as the Fleeman-McNeill Funeral Home. The appeal is also from a judgment in favor of plaintiff upon the policy as reformed.

The facts show that on August 13, 1923, John N. McNeill and William J. Fleeman owned a building in the city of St. Joseph and had as a tenant therein the Fleeman-McNeill Funeral Home, a corporation, operating an undertaking establishment; that on or about said day one Ilma Binswanger (not an employee of the corporation),

while walking upon the sidewalk in front of the premises, tripped over a wire stretched between the building and an electric light standard being erected by the Fleeman-McNeill Funeral Home in the space between the sidewalk and the curb in front of its place of business. A suit was brought by Mrs. Binswanger against the Fleeman-McNeill Funeral Home, a corporation, to recover damages. The defendant therein gave immediate notice to the defendant herein and complied with all of the requirements of the indemnity insurance policy which had been issued by defendant. Defendant disclaimed liability on its policy of insurance above described and declined to assume the defense of the cause or any obligations under its policy, for the injuries to Mrs. Binswanger. Pending the action Mrs. Binswanger died from causes not connected with the accident and the action was revived in the name of her administrator. Subsequently, while the cause was pending, the Fleeman-McNeill Funeral Home became a bankrupt and plaintiff filed an amended petition making the trustee in bankruptcy a party defendant. The cause came on for trial and judgment was rendered in favor of plaintiff against the Fleeman-McNeill Funeral Home and the trustee in bankruptcy for the sum of $3,000. Plaintiff received from the estate of said bankrupt the sum of $1550, leaving a balance due upon his judgment of $1450. Upon the closing of said bankrupt estate plaintiff caused execution to be issued upon his judgment against the Fleeman-McNeill Funeral Home, a corporation, which execution was returned unsatisfied. Thereupon, the plaintiff in that case brought this action. The action is in two courts, one to reform the policy and the other to recover from the defendant under the policy the balance due plaintiff under his judgment above described.

It is first insisted by the defendant that the court erred in reforming the policy. The facts relating to the issuance of the policy in the wrong name through a mutual mistake show that John M. McNeill and William J. Fleeman were the principal stockholders in the Fleeman-McNeill Funeral Home, a corporation, of which Fleeman was the president and McNeill was the secretary and treasurer. Shortly prior to the issuance of the policy by defendant one Louis Nash, representing the defendant, solicited McNeill to take out a policy of liability insurance. In all of the negotiations between the insured and the insurer leading up to the execution and delivery of the policy McNeill acted solely for the insured and Nash solely for the insurance company.

McNeill testified that Nash solicited him to take out insurance for the Fleeman-McNeill Funeral Home, a corporation, which resulted in the witness agreeing to take out a policy and his telling Nash to have the policy cover the Fleeman-McNeill Funeral Home, a corporation. McNeill testified that the policy was to cover liability "for any one that might get hurt around the property;" that

the witness told Nash that he wanted the policy to cover "the operations of the Fleeman-McNeill Funeral Home." The evidence is undisputed that the corporation paid the premium upon the policy. McNeill, further testified that Nash procured from the witness the desired information about the policy which information Nash wrote down; that sometime after Nash delivered the policy the witness looked at it and was about to put it away but noticed that the policy was made out to John M. McNeill and William J. Fleeman instead of the Fleeman-McNeill Funeral Home; that he communicated with Nash and told him "the policy was written up wrong." The evidence shows that one Stubbs, operating under the name of the Stubbs-McDonald Agency, was the local agent of the insurance company. Nash worked out of Stubbs' office. McNeill further testified that Nash reported that he had seen Stubbs and that the latter had told Nash that the policy was written the way it was "in order to cover the Fleeman-McNeill Funeral Home, a corporation, John N. McNeill and William J. Fleeman, and it was all right." McNeill accepted this statement and retained the policy.

Nash, testifying for the defendant, denied the conversation testified to by McNeill relative to the policy covering the corporation as well as the individuals. Nash testified that he had more than one interview with McNeill and that in the first one McNeill told him that one Strop had an interest in the reale state but not in the undertaking business, and what was wanted was some kind of liability insurance to protect Strop. The witness testified that he knew that the undertaking business was carried on under the name of the Fleeman-McNeill Funeral Home, a corporation, and that he tried to get McNeill to take out a policy of liability insurance that would cover the corporation; that McNeill said, "no, that is not what we want. We want a policy protecting us as joint owners of this property" and not as operators of the Funeral Home. He further testified that when he first attempted to interest McNeill in insurance for the corporation McNeill requested him to find out the cost of such insurance; that the witness had a young lady who was in the office of Mr. Stubbs (Stubbs was merely a local agent and had no authority to execute policies of insurance) write to F. D. Hirshberg & Company, general agent of the insurance company located in St. Louis; that several letters were exchanged between the general agent and the local agent relative to the kind of insurance desired and the cost thereof. Nash dictated some of the letters himself. The first letter, as was all of the correspondence, was headed *"Re Fleeman-McNeill Funeral Home"* and recited:

"This piece of property 100 feet by 120 feet is *owned by the Fleeman-McNeill Funeral Home and the building* situated at 1208 Francis *is occupied by them.* The store building at 1204 Francis street is to be torn down and the building shown in the rear of 1204 Francis

has already been removed. They do not own the building in the rear of 1212 Francis but it is *occupied by them as a garage and warehouse."* (Italics ours.)

On May 12, 1922, the St. Louis office answered this letter. In its letter the St. Louis office inquired whether the applicant wanted an owner's or landlord's contingent public liability policy or whether the applicant desired insurance as occupant of the premises covering their operations as undertakers and funeral directors and quoted rates for both kinds of policy. This letter also stated:

"If these people occupy the premises described and desired to cover their operations as undertakers and funeral directors, it will be necessary to cover the risk by Employers and Public Liability policies. . . .

"If they only wish to cover their liability as owners or landlords of the premises a general liability policy may be written on which the premium would be about $12 total on the two buildings for $5/10,000 limits. According to the diagram enclosed by you the main building has a ground floor area of 2550 feet, and we assume that this is a two-story building with a total area of 5100 feet. We also assume that the garage and warehouse building is one story only and the quotation of $12 is based on these dimensions. Written under a general liability policy the policy would not cover any liability due to their operations as undertakers or funeral directors, which, as stated, can only be covered under the regular forms of employers and public liability policies."

The witness further testified that he took this letter to McNeill and explained it to him and that McNeill said that he did not care to "protect the employees;" that he wanted to protect Fleeman, Strop and himself "in this building." The witness testified that it was then that McNeill "made this decision to buy what I would call a general liability policy for owners or landlords, a liability policy covering only the premises." McNeill testified in rebuttal that Strop had no interest of any kind in the building.

After this interview had between Nash and McNeill other letters were exchanged between the Stubbs-McDonald Agency and F. D. Hirshberg & Company relative to the insurance. (This correspondence is shown in the record.) A letter dated May 15, 1922, from the local agent to the general agent reads as follows:

"Replying to your letter of May 12th we enclose herewith Submissions of Particulars for a Landlord's liability policy covering premises shown on tracing previously sent you for a term of three years.

"Kindly forward policy with your usual promptness, and oblige."

To this letter the general agent at St. Louis replied on May 18, 1922, and among other things stated that:

"The policy applied for in this case would be limited to public liability coverage occurring in or on the premises or ways adjacent, and not due to Assured's business operations.

"We believe that what Assured desires is a combination of Employers' and Public Liability Insurance to be written on a pay roll basis at the rates and under the conditions outlined in our letter of the 12th inst."

On May 26, 1922, Stubbs wrote the general agent stating that the applicant "desires only the contingent form of landlord's liability as outlined in your letter of May 12th." In none of these letters was the St. Louis office advised that Fleeman and McNeill were the owners of the premises but all of them stated that the Fleeman-McNeill Funeral Home desired the insurance without stating whether the applicant was a corporation or otherwise.

Thereupon the policy in question was executed by one Gray, as attorney-in-fact for the defendant, who was associated with the general agent in St. Louis, and the same was forwarded to the local agent and was delivered by Nash as aforesaid.

The "Submission of Particulars for Insurance" being in the nature of an application for the policy but not signed, which was written by Nash describing the premises and received by the St. Louis office on May 17, 1922, contains the following:

"Statement 1: Name of Assured, John M. McNeill and Wm. J. Fleeman, owners and operators of Fleeman-McNeill Funeral Home.

"Statement 2: Address of Assured, 1202-08 Francis street.

"Statement 3: The Assured is, Corporation.

"Statement 4: Location of the premises is: 1202-08 Francis street. The premises are occupied as Funeral Home, 'Undertakers.' The estimated number of employees is: 5. The occupation of Employees is: Embalmers and Assistants. The estimated Compensation is: $5000.

"Statement 5: The interest of the Assured in the premisses is Owners.

"Statement 6: The Assured manages the premises, except as follows: Small grocery store at 1202 Francis street, same to be torn down within thirty or sixty days.

"Statement 7: The insured occupies the premises, except as follows: Small grocery store at 1202 Francis street, same to be torn down within thirty or sixty days.

"Statement 11: There is no other liability Insurance carried by the Assured on the Risk, except as follows: No. None other than automobile."

The policy provided that it covered:

"Bodily injuries, including death at any time resulting therefrom, accidentally sustained by any person or persons other than employees of the Assured while within or upon the premises or the ways adja-

cent thereto, or elsewhere, by reason of the occupation, the use, the maintenance, the ownership or the control of the said premises by the Assured as described in the Declarations, including the making of such repairs and ordinary alterations as are necessary to the care of said premises and their maintenance in good condition.''

It contained an endorsement or rider thereon reading as follows:

''Attached to and forming a part of policy No. GL.PL-1368 issued to John M. McNeill and Wm. J. Fleeman, operating as Fleeman-McNeill Funeral Home.

''In consideration of the rate of premium at which this policy is issued, it is hereby understood and agreed that the insurance granted by this policy does not cover or apply to accidents sustained by any person or persons whomsoever resulting from assured's business operations as Undertakers, Embalmers or Funeral Directors, anything in the policy to the contrary notwithstanding.''

The declarations contained in the policy, under item one, provided:

''Name of Assured, John M. McNeill and Wm. J. Fleeman, operating as Fleeman-McNeill Funeral Home. P.O. Address, 1202-08 Francis St., St. Joseph, Missouri. The Assured is a Co-partnership.''

The declarations also provided as follows:

''Item 5. The interest of the Assured in the premises is owner.

''Item 6. The Assured manages the premises, except as follows: No exceptions.

''Item 7. The Assured occupies the premises, except as follows: May be occupied by tenants in part,'' (evidently referring to the grocery store building located at 1202 Francis street).

Aside from McNeill and Nash two other witnesses testified, to-wit: Stubbs and Gray (witnesses for the defendant). The testimony of Stubbs tends to show that he understood when the matter of insurance first came up that Fleeman-McNeill in their personal capacities were operating the Fleeman-McNeill Funeral Home but that he afterwards found out that the Fleeman-McNeill Funeral Home was a corporation; that ''when the question came up of separate ownership and the question of whether we were to cover the Fleeman-McNeill Funeral Home, incorporated, or the owners of the real-estate and building, then I got into the case, and it was decided that owners' liability policy was what was wanted.''

''Q. You decided that? A. Nash told me, and quoted them rates for public liability and employers' liability for the funeral home and owners' public liability;'' that he got into the case ''as soon as the correspondence was started and the question of ownership of the property came up;'' that it was at this time that he was under the impression that Fleeman-McNeill were personally operating the Fleeman-McNeill Funeral Home; that the Fleeman-McNeill

Funeral Home as occupants of the property could have procured a policy against liability to the public; that Nash reported to him that what was desired was a policy for the owners of the property; that when the application first came into his office he understood that the Fleeman-McNeill Funeral Home owned the property and "as our discussion developed it proved that the ownership of the property was in the name of Fleeman and McNeill;" that he discovered the true ownership after he sent Nash "back to get that information," which was immediately;" that Nash told him that the insurance was wanted at the location in question and that the witness knew that the Fleeman-McNeill Funeral Home, which he understood to be a partnership, was occupying the premises; that he understood that the Fleeman-McNeill Funeral Home "wanted the insurance at that location but the character of insurance was a matter that they were trying to agree upon;" that later at the time the witness wrote the letter to the St. Louis office dated May 26th, he found that the property was owned by Fleeman and McNeill. Stubbs denied that he told Nash that the policy covered the corporation as well as the individuals.

The testimony of Gray was to the effect that what he knew about the matter he gleaned from the correspondence and the Submission of Particulars we have mentioned; that his understanding was that the owners of the premises desired the insurance and that what was wanted was an owner's or landlord's public liability insurance policy, which is generally referred to as a general liability policy; that the issuance of such a policy is based upon the area and frontage of the building; that the company issued another public liability policy to operators of business establishments, in which event it was necessary for the assured to take out an employer's liability insurance policy; that the company would issue an employer's liability policy without the public liability policy but it would not issue a public liability policy to an operator of the business unless an employer's liability policy was taken out at the same time; that these policies to operators of businesses, instead of being based upon the area and frontage of the building, would be based upon a pay-roll basis; that a public liability policy was less hazardous than an employer's liability policy and less expensive; that his company was not interested as to whether the insured were individuals or a corporation; that the policy would have been issued just the same.

"Q. You understood (from the letter of May 11, 1922) by this that the Fleeman-McNeill Funeral Home was applying for insurance? A. Whoever was applying for insurance was doing business there, whether a corporation, co-partnership or whatever it might be.

"Q. Did you intend to insure the Fleeman-McNeill Funeral Home, whether a corporation, partnership, or anything else? A. We did

if that was the legal title of the assured, that was our intent;" that he understood when issuing the policy that it was the owners of the property who desired the public liability insurance and that such owners were Fleeman and McNeill whom he intended to insure as individuals; that he did not know that Fleeman and McNeill were not operating the Funeral Home but took it for granted that the Fleeman-McNeill Funeral Home was a partnership composed of McNeill and Fleeman and that they were not only the owners of the building but the operators of the business.

It makes little difference as to the understanding of Stubbs and Gray relative to the matter as to who should be insured if there was an agreement between McNeill and Nash that the insurance was to be in favor of the corporation, and we think that the testimony relative as to what occurred between these two fully substantiates the conclusion of the chancellor that there was a mutual mistake in the writing of the policy.

Nash testified that he knew that Fleeman and McNeill owned the property and that they, as individuals, were not conducting the funeral home but that the business was being conducted by the Fleeman-McNeill Funeral Home, a corporation. While he attempts to deny the agreement as testified to by McNeil the facts and circumstances tend strongly to show that his denial is not to be believed in view of McNeill's positive testimony upon the subject. The documentary evidence, alone, in the case tends to contradict Nash's denial as well as Stubbs' testimony that the latter finally learned that Fleeman and McNeill, personally, owned the premises. In the first place the statement of "Particulars for Insurance" prepared by Nash and examined by Stubbs before it was forwarded to the St. Louis office, recites that the insured was a "corporation." Statement No. 4 in the Submission of Particulars for Insurance, would indicate that the assured was conducting a funeral business on the premises. Statement No. 6 states that the assured managed the premises except for a small grocery store upon them. Statement No. 7 shows that the insured occupied the premises. Of course, the occupier of the premises was the corporation. Statement No. 11 indicates that the assured carried liability insurance upon automobiles, the clear inference being that the automobiles were owned by the corporation that conducted the business on and occupied the premises and not the owners of the property. The letters that Nash addressed to F. D. Hirshberg & Company, general agent in St. Louis were all headed "Re Fleeman-McNeill Funeral Home," as well as the letters sent to the local agent by that company. There was no change in the information as to who owned the building, contained in Stubbs' letters after he says he learned that it was owned by Fleeman and McNeill individually. When the policy was returned

Nash delivered it. The endorsement upon it shows that the persons insured were "Undertakers, Embalmers or Funeral Directors."

It would appear that the policy was written from the information furnished the St. Louis office contained in the "Submission of Particulars," for the wording of the policy is exactly the same as that contained in the submission of particulars except the policy described the insured as a co-partnership. It would appear that Nash in preparing the submission of particulars overlooked, either carelessly or ignorantly, the difference between insuring John M. McNeill and Wm. J. Fleeman as owners of the corporation and the corporation. But it almost conclusively appears from the documentary evidence that it was the corporation that he intended to be insured. The testimony discloses that all of the information furnished the St. Louis office had its origin in Nash. Nash knew that the Fleeman-McNeill Funeral Home was a corporation and all of the correspondence is headed "Re Fleeman-McNeill Funeral Home." There is much in the testimony tending to show that Nash dictated the first two letters to the St. Louis office. There is nothing in the correspondence to indicate that the Fleeman-McNeill Funeral Home was a partnership. A fair interpretation of the documentary evidence discloses that Nash knew that the Fleeman-McNeill Funeral Home was a corporation but thought that it was the owner of both the real estate and the business.

During his cross-examination Nash, confronted with the statement of "Particulars for Insurance" which he prepared and which recited that the assured was a *corporation*, testified:

"Q. Why do you remember all the details of your conversation with John McNeill? A. He said specifically what he wanted, and I know the concern, stockholders, more or less interested.

"Q. There he said he wanted the corporation insured—the insured is a corporation? A. Yes.

"Q. When you wrote that you knew what you were doing? A. I presume so."

Almost immediately he took back this testimony by stating that the assured was not the corporation because what McNeill desired was coverage for the owners of the property, to-wit: Fleeman, McNeill and Strop.

Gray testified that the person who prepared the policy changed the designation of the insured as a corporation, as indicated in the submission of particulars, to a co-partnership "to conform to the name of the insured as it was given in the application." That is to say that the policy was issued because item one of the submission of particulars taken in a strictly technical sense would indicate that the insured was to be McNeill and Fleeman as individuals. However, a reading of the whole of the submission of particulars would plainly indicate that the party desiring insurance was operat-

ing an undertaking business as well as being the owner of the premises, and shows in view of the subsequent issuance of this policy that the defendant had no rule requiring employers' liability insurance under the circumstances. While the Submission of Particulars prepared by Nash, and upon which the policy was issued, was perhaps ambiguous as to whether the appellant was a corporation or individuals, Nash himself knew that the operator of the business was a corporation. Therefore, it is almost conclusively shown by the Submission of Particulars itself, disclosing as it does on its face that the applicant was a corporation and conducting the business on the premises, that Nash intended to insure the corporation. Undoubtedly he thought that the corporation was the owner of the premises as well as the operator of the business.

We are not unmindful of the rule that in order for a court of equity to reform a written instrument on the ground of mistake the testimony sustaining the court's action must be clear, cogent and convincing and leave no room for reasonable doubt. [Robinson v. Korns, 250 Mo. 663, 675; Wilhite et al. v. Wilhite, 284 Mo. 387, 395; 5 Pomeroy's Equity Jurisprudence, p. 4740 (2 Ed.).] The trial court saw the witnesses and was justified in arriving at the conclusion that the plaintiff made out a case, even in view of this unusual burden cast upon him.

However, it is claimed by the defendant: "The party asking reformation must establish, by clear and convincing proof, a superior equity in himself not barred by negligence or laches." Laches, if there were any in this case (and we think there was none), was not pleaded by the defendant, and therefore, it is not now in position to make any point in reference to that matter. [Hecker v. Bleisch, 3 S. W. (2d) 1008; Coleman v. Ins. Co., 273 Mo. 620.]

Whether or not negligence in this kind of a case is a matter of defense and can be taken advantage of by defendant, if it appears in plaintiff's testimony even though not pleaded by defendant, which it was not, we are not convinced that there was any negligence on the part of McNeill in this case. As soon as he found out that the policy was written to cover the wrong parties he took up the matter with Nash and Nash reported to him that the policy not only covered the individuals but the corporation. While Nash denied that he did this we are not disposed to take his testimony upon any subject in connection with the case. While Stubbs testified that he did not tell Nash the things attributed to Stubbs, yet, Nash may have communicated the information to McNeill without consulting Stubbs. In other words Nash may have made up out of the whole cloth what he told McNeill. If McNeill had been a lawyer he would not have been justified in concluding that the policy covered the corporation as well as the individuals, even though Nash assured him to the contrary. However, in one place

in the policy it described McNeill and Fleeman as individuals and in another portion the assured is described as the operators of the Fleeman-McNeill Funeral Home, which McNeill evidently had informed Nash was a corporation, and in another portion the policy excludes liability for injuries resulting from the operation of assured's business. In view of these facts and Nash's assurances to McNeill we are not disposed to convict McNeill, who was not a lawyer, of negligence in reference to the matter, in view of the fact that he sought advice on the matter from the person he would naturally go to and the policy might well be misleading to a layman on the point in question in view of all of the circumstances surrounding its taking out by McNeill.

It is claimed that "neither plaintiff nor his intestate were parties to the contract of insurance, nor do they bear such relationship to it or to Fleeman-McNeill Funeral Home as entitles him to maintain an action for reformation." In this connection it is argued that "the rule uniformly applied in determining who are entitled to reformation, limits the remedy to original parties *or those in privity with them.*"

The policy contains the following provision:

"The insolvency or the bankruptcy of the Assured shall not relieve the Corporation from the payment of such amount hereunder as respects any such injuries sustained before such insolvency or bankruptcy as would have been payable but for such insolvency or bankruptcy. If, because of such insolvency or bankruptcy, an execution against the Assured is returned unsatisfied in an action brought to recover damages on account of any such injuries sustained before such insolvency or bankruptcy by the injured or by any other persons claiming by, through or under the injured, then an action may be maintained by the injured, or by such other persons claiming by, through or under the injured, against the Corporation, subject to the provisions and the limits of this policy, for the amount of the judgment in said action."

It is well settled that a contract may be made for the benefit of a third person and such a contract, when supported by a valid consideration, may be sued upon by such person. The rule is well stated in Uhrich v. Globe Surety Co., 191 Mo. App. 111, 114, as follows:

"A contract between two parties upon a valid consideration may be enforced by a third party when entered into for his benefit. *This is so though such third party be not named in the contract and though he was not privy to the consideration.* It is sufficient in order to create the necessary privity that the promisee owe to the party to be benefited some obligation or duty legal or equitable which would give him a just claim." (Italics ours.)

In Lumber Co. v. Schwartz, 163 Mo. App. 659, 665, it is stated:

"A third person for whose benefit a contract is made may enforce the contract in an action prosecuted in his own name and in an action on a common-law bond of the nature of that in suit a materialman for whose benefit the bond was taken may sue as plaintiff."

That there was such a privity between the insured and the deceased, to whom the insured owed a duty not to negligently injure, there can be no question. [Finkelberg v. Continental Cas. Co. (Wash.), 219 Pac. 12; Arizona Mutual Auto Ins. Co. v. Bernall (Ariz.), 203 Pac. 338; Gugliemetti v. Graham (Cal.), 195 Pac. 64; Stusser v. Mutual Union Ins. Co. (Wash.), 221 Pac. 331, 333; Rose v. Zurich etc. Co. (Pa.), 145 Atl. 813; U. S. F. & G. Co. v. Williams (Md.), 129 Atl. 660; American Automobile Ins. Co. v. Struwe (Tex.), 218 S. W. 534; 13 C. J., p. 711; 36 C. J., p. 1132; 31 C. J., pp. 457, 458; Grennell v. Cass County, 187 N. W. 504; Cox v. Fid. & Dep. Co., 157 Mich. 59; People v. Pub. Serv. Comm., 138 N. Y. S. 434, 435.]

The evidence shows that while Fleeman-McNeill Funeral Home, a corporation, was not insolvent or bankrupt on the day Mrs. Binswanger was injured, at the time this suit was instituted it was insolvent and the estate of that corporation had been fully wound up and distributed among its creditors. It is difficult to imagine how the rights of Fleeman-McNeill Funeral Home can be adversely affected by a reformation of the policy. [No effort is being made to change the contract but merely to cause the evidence of the contract, the writing, to speak the truth. Plaintiff being entitled to sue upon the contract was entitled to the benefit of the true contract and was, therefore, entitled to have the evidence of that contract corrected.] The defect in the parties, if any, was apparent on the face of the petition while a demurrer was filed attacking the petition on the ground not assigned the demurrer was waived by defendant's action in filing an answer and going to trial. [Zinc Co. v. Amsden Leonard & Co., 125 Mo. App. 512; Haughey, etc. v. Joyce, 41 Mo. App. 564.]

It is substantially admitted by the defendant that if there is any privity between plaintiff and the insured that plaintiff is entitled to bring this suit for reformation. From the authorities we have cited it is quite apparent that such privity exists.

We have examined the cases of Partridge v. Partridge, 220 Mo. 321; Crowley v. Crafton, 193 Mo. 421, 432, cited by the plaintiff, and find that they are not in point. They merely hold that a court of equity will not reform an instrument which constitutes merely a voluntary executory contract. In the case of Howsman v. Trenton Water Co., 119 Mo. 304, it was held that a citizen whose house was destroyed by fire because of an insufficient water supply could not maintain an action upon a contract between the city in which

he lived and the water company where the water company merely agreed with the city to respond in damages for loss by fire caused by it failure to comply with the contract. This case is unlike the Howsman case. The Fleeman-McNeill Funeral Home owed a legal duty to pedestrians not to negligently injure them. Therefore, in procuring the policy the Fleeman-McNeill Funeral Home was seeking to protect itself against lawsuits on account of possible violations of that duty. In the Howsman case the city did not owe any legal duty to users of water to maintain sufficient pressure to extinguish their fires. In the Howsman case the contract did not expressly provide that in the event there was failure on the part of the water company to furnish a reasonable or adequate supply of water to extinguish fires that a citizen could sue it, and one of the things the court determined was whether or not the contract was for the benefit of any other than the city. This is clearly disclosed at page 314 in the opinion where the court says:

"It does not clearly appear that the benefit was intended for the citizens in their individual capacity, but may have been intended for the protection of the municipality, and in the absence of express power in the municipality to make contracts for the indemnity of its individual citizens, should be so construed. *City ex rel. v. O'Connell*, 99 Mo. 357."

In the case at bar the policy expressly provides that the injured party may sue the defendant.

It is insisted that the evidence shows that Nash was merely a broker representing plaintiff and was not the agent of the defendant. There is no merit in this contention. The evidence relating to this matter shows that no one applied for insurance but that the same was solicited by Nash; that Nash represented to McNeill that he was with the Stubbs-McDonald Agency and McNeill regarded him as agent for the defendant; that Nash delivered the policy; that he operated out of the office of the Stubbs-McDonald Agency which furnished him a desk in the office therein. It was his business to solicit insurance and present the applications to the Stubbs-McDonald Agency and the agency had the selection of accepting or refusing the applications. In other words in all cases Nash was required to give the agency first privilege of taking the insurance. The evidence further shows that Stubbs requested Nash to get the particulars in this case; that the statement of the particulars for insurance was prepared by Nash; that Nash dictated letters for the Stubbs-McDonald Agency; that he notified the general agent at St. Louis for the Stubbs-McDonald Agency as to the kind of insurance that insured wanted. Although Stubbs testified that Nash was merely a broker working out of Stubbs' office and did not represent the Stubbs Agency, he was writing the St. Louis office for Stubbs. The evidence further shows that the forwarding of the statement of the particulars for

insurance was done by Nash for Stubbs; that Nash's name was not upon the window of the office as conducting business upon his own account; that Stubbs paid him a proportion of the premiums upon the business he procured; that the Stubbs-McDonald Agency carried charges against customers for insurance placed by Nash and charged such customers upon the books (the items being marked to indicate that Nash had procured the business); that Nash made collections of insurance premiums for policies he procured. We think that under the circumstances Nash was an employee of the Stubbs-McDonald Agency and not a broker representing the insured. [Benanti v. Security Co., 9 S. W. (2d) 673, 675; Smith v. Ohio Millers' Mutual Fire Ins. Co., 6 S. W. (2d) 920, 928; Lehmann v. Fire Ins. Co., 183 Mo. App. 696, 706, 707; Farber v. American Ins. Co., 191 Mo. App. 307, 320, 323.]

In relation to the second count of the petition it is claimed that plaintiff is not entitled to recover because the standard which was being erected at the time deceased fell over the wire "was a new structure and the work cannot by any stretch of the imagination be classed as 'such repairs and ordinary alterations as are necessary to the care of said premises and their maintenance in good condition,' which is the language of the coverage clause." However, the coverage clause is broader than this. It provides that these things are included, but states that it covers bodily injuries and death sustained by persons "while within or upon the premises described in the declarations, or the premises *or ways* adjacent thereto, or elsewhere." In the clause relating to exclusions the policy provides that injuries "growing out of or due to the making of additions to, structural alterations in, . . . the premises" are excluded except under certain conditions, which in this case were not met by the insured, and the endorsement on the policy excludes accidents "resulting from assured's business operations as undertakers, embalmers or funeral directors, anything in the policy to the contrary notwithstanding."

It is claimed that the erection of the light standard was clearly the making of an addition within the definition of the policy and did not constitute repairs and ordinary alterations. However, the exclusion clause relates to the making of additions, etc., "of the said *premises*," and that part of the coverage clause relating to repairs and ordinary alterations refers to work done on the *premises*. Neither cover the *ways* adjacent to the premises, and the erection of the light standard was not the making of additions to, structural alterations or an extra-ordinary repair of the *premises*, but it was work done outside of the premises. This we must hold in the light of the fact that the policy distinguishes between the *premises* and the *ways* adjacent thereto.

As far as the claim that the standard was to be used for lighting the premises used by insured for the purposes described in the endorsement on the policy, there is no merit in this contention. The risks eliminated by the endorsement on the policy were those arising while assured was conducting its business. The erection of the standard was just as useful to other and subsequent businesses that might be conducted upon the premises, whether undertaking or otherwise, as it was to the business then being conducted upon it. It therefore did not essentially pertain to the undertaking business. It cannot be said to have resulted in an accident sustained from the assured's business operations as undertakers, etc.

The judgment is affirmed. *Arnold, J.,* concurs; *Trimble, P. J.,* absent.