Marshall, Admx., et al., v. Keystone Mutual
Casualty Co.

*Solomon Hurwitz* and *Macey E. Klein,* for plaintiffs.
*Wilhelm E. Shissler,* for defendant.

WOODSIDE, J., January 29, 1945. — In this action plaintiffs seek to reform a liability insurance policy and recover under the policy as reformed.

Vincent Marshall, a child of pre-school age, was killed by a truck which plaintiffs claim was insured by defendant. To recover for the death an action was brought by Curtis Marshall, administrator of the estate of Vincent Marshall, deceased, in behalf of the estate of Vincent Marshall, and in behalf of Lerow Marshall and Curtis Marshall against R. Harry Yates and Myrtle Gregory, now M. Lucyle Yates, individually and trading and doing business as Yates Coal Company.

Counsel who had entered their appearance for defendant appeared before the court when the case was called for trial and withdrew from the case, stating that defendants were present in court and knew about it. Neither defendants nor any attorney on their behalf participated in the trial.

The jury brought in a verdict in favor of Curtis Marshall as administrator of the estate of Vincent Marshall in the sum of $7,496.40, and for the parents of the deceased child in the sum of $1,766.50. Judgments were entered on the verdicts on February 8, 1944, to no. 232, September term, 1943. No appeal has been taken and these judgments remain unsatisfied.

After the entry of these judgments this action was brought to recover from the Keystone Mutual Casualty Company. It is the contention of plaintiffs that the casualty company is liable under a policy of insurance issued to "Harry Yates and/or Myrtle Gregory", which policy should be reformed to describe the truck which killed Vincent Marshall.

The statement of claim sets forth that the agent of defendant had pointed out to him in April 1942, by Yates and Gregory, three trucks, a trailer, and an automobile which were to be covered by what is commonly called liability insurance, and that the agent advised them a policy covering the designated vehicles would be issued by the Keystone Mutual Casualty Company. It is alleged that among the trucks pointed out was a 1935 Ford lift dump truck bearing Serial No. BB-181721613 the property of Harry Yates (and the truck which later killed Marshall) but that when the policy was issued on April 23, 1942, the aforesaid truck was mistakenly described as a vehicle then owned by Gregory, bearing Serial No. BB 182128891, and not intended to be covered. This alleged error was carried over in a renewal policy of defendant issued April 23, 1943. This later policy was in effect at the time of the accident, and is the one which plaintiffs seek to reform and under which they are now suing.

Error followed error when on May 27, 1943, it is alleged, the agent for defendant was directed to cancel the insurance covering several vehicles including the one with Serial No. BB-......57, but instead of canceling the insurance as to vehicle with Serial No. BB-.. ...57, he canceled it as to vehicle BB-......13, which had been erroneously described as BB-......91. It is contended by plaintiffs that from April 23, 1942, until after the accident defendant had vehicle with Serial No. BB-......13 covered with liability insurance but had erroneously described the vehicle in its policies.

In its affidavit of defense the insurance company raised a number of questions of law which we are called upon to decide.

In the first place defendant contends that plaintiffs cannot recover because the insureds were negligent in not examining their policy and discovering the error, and that their negligence bars the claim by plaintiffs. It asserts that it is "the insured's duty to read his policy so as to ascertain the contents and, if the policy is unsatisfactory, to object thereto at that time, and not wait for loss and then seek reformation". Although this may be the law in some jurisdictions and under certain circumstances: Fidelity & Guaranty Fire Corp. v. Bilquist et al., 108 F.(2d) 713 (1940) (Wash.); Berkowitz v. Westchester Fire Ins. Co., 106 N. J. Eq. 238 (1930), it neither follows the general rule nor is it the law in Pennsylvania.

The general rule is set forth in A. L. I. Restatement of the Law of Contracts, §508, as follows:

"The negligent failure of a party to know or to discover the facts, as to which both parties are under a mistake does not preclude rescission or reformation on account thereof."

Applying the rule to the specific question of the duty of an insured to read his policy, the Supreme Court of Pennsylvania said in Broida, to use, v. Travelers Ins. Co., 316 Pa. 444, 448 (1934):

"Defendant also contends that plaintiff is barred from reformation by his own negligence. This argument is based on the admitted fact that the policy was delivered to plaintiff sometime before the accident, and that he made no examination of it but put it in his safe without looking at it. However, where the elements required for reformation are otherwise present, even negligent failure of plaintiff to discover the variance between the instrument as written and the mutual understanding of the parties is not fatal to his right to have it reformed: Haines v. Stare, 249 Pa. 494. . . ."

It is contended by defendant that plaintiff should proceed in equity to have the policy reformed before bringing an action at law to recover on the policy—that the policy cannot be reformed in this action because it is in law. This apparently is the rule in a few States, particularly those which have separate courts of chancery, and in which the jurisdiction of the chancery courts and the jurisdiction of the law courts are carefully separated: Taylor et al. v. Glen Falls Ins. Co., 32 So. 887 (Fla.) ; Gleason et al. v. Prudential Fire Ins. Co., 151 S. W. 1030 (Tenn.) ; Norwich Union Indemnity Co. v. H. Kobacker & Sons Co., 31 F.(2d) 411 (Ohio) ; Hanson v. National Liberty Fire Insurance Company of America et al., 126 A. 453 (N. J.).

Again, however, this is not in accordance with the general rule which is set forth in Restatement of the Law of Contracts, §507, as follows:

"Where circumstances justify reformation of a writing, affecting the contractual relations of the parties to the writing, a court may in its discretion without a preliminary decree of reformation give effect to the transaction as if it had been reformed."

The practice of reforming written instruments in actions brought on them in law without first having the matter determined in a separate equity proceeding has been followed in Pennsylvania so consistently, and over such a long period of time that there can no longer be any doubt as to the law of this Commonwealth concerning it.

That this should be the law in Pennsylvania is easy to understand when we consider the peculiar nature of the jurisprudence of this Commonwealth. In a speech made at the first meeting of the Pennsylvania Bar Association on January 16, 1895, Hon. John W. Simonton, then president judge of this court, said:

". . . the peculiar nature of the jurisprudence of Pennsylvania, the essence of which is that the substantive law is the same whether the proceeding be in the

common law or the equity form, has never had that attention called to it which it deserves. Several writers on this subject have said that the essence of reform of judicial procedure in the other States, beginning with New York and extending to England, is the abrogation of the distinction between law and equity, and a provision that, where the rules of principles of law are different from those of equity, the equity principle shall control. . . . More than a century ago, in 1787, this improvement in the law was introduced in Pennsylvania, and has existed ever since. . . . Pennsylvania, then, instead of being in the rear, has been in front in law reform; for while this is a reform rather in the substance of the law than in the procedure, yet it is acknowledged by all who have advocated the reform of procedure in other States, that this is the point to be gained—doing away with the distinction between law and equity." Vol. 1, First Annual Report of Pennsylvania Bar Association, 27, 28.

The development of this in Pennsylvania is historical. Except from 1720 to 1738, we have never had distinct chancery courts in Pennsylvania.[1] After the

---

[1] In 1720 at the suggestion of Governor Wm. Keith that only the representative of the King could hold a court of chancery, the Pennsylvania Assembly authorized the Governor and the six senior members of his council to administer equity as a court of chancery. Governor Keith was trusted by the people of Pennsylvania, but his successor, Governor Gordon, was not, and the people began to see the danger of judicial administration by the executive, and in 1736 they "resolved that the court of chancery as then established was contrary to the charter of privileges." Although the Governor fought back, by 1738 the court ceased to function, and was never re-established. The colonists never again had enough faith in their executive to permit him to conduct a court of equity, and they suffered the inconvenience of being without a court of chancery in preference to submitting to executive administration of such a court. People have a way of obtaining justice and equity from their own officials when they are not dominated by king or dictator. As a result the law judges began to administer equity. Pennsylvania thus became a pioneer in administering equitable principles through the medium of common law forms, a practice which took several generations to perfect.

chancery court ceased to function " 'The necessity of enforcing equitable principles and remedies led to various devices whereby they were enforced under common-law forms, the courts asserting in themselves substantial powers to be executed in that manner:' " Eisenberg v. Eisenberg, 105 Pa. Superior Ct. 30, 32 (1932).

Thus in 1785 Chief Justice McKean referred a case involving equitable principles to the jury setting forth that the defect of equitable jurisdiction "has necessarily obligated the court, upon such occasions, to refer the question to the jury, under an equitable and conscientious interpretation of the agreement of the parties; and it is upon that ground, the jury must consider and decide the present cause": Wharton et al. v. Morris et al., 1 Dallas 124, 125.

In 1822 the Supreme Court held that wherever chancery would execute a trust, or decree a conveyance, the courts of this State by the instrumentality of a jury will direct a recovery in ejectment: Peebles v. Reading, 8 S. & R. 483 (1822).

Subsequently the legislature granted equitable power to the court, but the grant of equitable powers to the Pennsylvania courts ". . . has not, however, taken from the law courts of the State the right to administer equitable principles under common-law forms . . .". Historical Outline of the Judicial System and Courts of Pennsylvania by Hon. Robert von Moschzisker, 1 Standard Pa. Practice, XX.

Where concurrent remedies co-exist at law and in equity for the enforcement of the same right the plaintiff may elect: 8 Standard Pa. Practice, 17, §4. ". . . remedies at law and in equity may co-exist, and be

---

It is interesting to note that exactly two centuries after the people of Pennsylvania dispensed with the court of chancery because experience had shown that executive domination of the judiciary did not bring equitable results, the people of this country through their Congress refused to permit executive domination of the Supreme Court of the United States through the medium of "court packing."

concurrent and at the election of the plaintiff: Ayci-
nena v. Peries, 6 W. & S. 243, 257 (1843) ; Biddle v.
Moore, 3 Pa. 161, 176; Church v. Ruland, 64 Pa. 432."
Pratt, to use, v. Waterhouse et al., 158 Pa. 45, 48
(1893). See also Koenig v. Currans Restaurant Co.
et al., 306 Pa. 345 (1932).

There are a number of cases decided in Pennsylvania
in which a written instrument was reformed 'in an
action brought on the instrument to recover in a court
of law.

In Allinger v. Melvin, 315 Pa. 298 (1934), where the
action was in assumpsit on a bond, the court held it
was proper to admit proof that the bond as drafted did
not express the agreement which had been made be-
tween the parties.

In Okes v. Fire Ins. Co., 12 Pa. C. C. 341 (1892),
Berks County, the court said (p. 342) :

"The reformation of written instruments is pecu-
liarly a function of chancery jurisdiction. Though, in
our jurisprudence, accomplished under common law
forms, it is controlled by the same principles that ob-
tain in a *court* of equity." (Italics supplied.)

In Seed Leaf Tobacco Growers Co. v. Lebanon Mu-
tual Ins. Co., 6 D. & C. 557 (Lancaster) (1925), an
action in assumpsit was brought on an insurance pol-
icy which the plaintiff contended did not set forth the
agreement made between it and the insurance company
and it was held that an insurance policy like other con-
tracts may be reformed on account of accident or mis-
take and that the plaintiff had a right upon a trial to
show the true intent of the parties. The court said
(p. 558) : "The statement properly avers the mistake,
and when sustained by proof, is sufficient to warrant a
recovery on the policy."

In The Farmers' Mutual Fire Ins. Co. v. Barr, 94 Pa.
345 (1880), where it was alleged that an insurance
company had agreed to insure a property for three
years from May 31, 1870, but the policy did not so set

forth, it was held that the plaintiff had a right to have the policy reformed or treated as reformed so as to correspond with the correct date. Although the court did not pass specifically upon the question of law and equity jurisdiction, the action was a legal one and the court did not suggest that it should have been brought in equity.

In Broida, to use, v. Travelers Ins. Co., 316 Pa. 444 (1934), the reformation of a policy of insurance in an action of assumpsit was approved by our Supreme Court.

We see no reason why plaintiff should be forced to proceed in equity to have the policy reformed when the entire matter can be disposed of in this one proceeding.

Defendant further contends that the mistake averred by plaintiffs in their statement of claim was "on one side only", and that to allow reformation there must be "mutual mistake". We do not understand the statement of claim as amended to aver that the mistake was unilateral. What plaintiff avers is that an oral agreement was made between the insurer, through its agent, and the insured, that truck with Serial No. BB-.....13 was to be covered by liability insurance and that it was the belief of both that this truck was properly described in the policy. The mistake was not one of identity but one of description, the truck having been, according to the statement of claim, properly identified by both insured and the agent of the insurer, but was erroneously described in the policy. In this respect the situation is similar to the case of Broida, to use, v. Travelers Ins. Co., supra, and Seed Leaf Tobacco Growers Co. v. Lebanon Mutual Ins. Co., supra.

We see no merit to the contention that the policy of April 23, 1943, cannot be reformed because the original "mistake" was made in the policy of April 23, 1942. According to the averments of plaintiff, both the insured and the agent of the insurer were of the mistaken

idea that a particular truck was described in both policies.

Neither do we see any merit in the contention that plaintiffs are not proper parties to maintain this action because Lerow Marshall, who had been appointed administratrix pro tem of the estate of Vincent Marshall, did not file her administrator's bond promptly. The father of the deceased child, who was administrator of the estate, was inducted into the military service and the mother petitioned the Orphans' Court of Dauphin County to be appointed substituted fiduciary on March 20, 1944, whereupon an order was made by that court on that date appointing her "upon her filing her own security in the sum of $1000." On May 2, 1944, the bond was approved by the orphans' court "as of March 20, 1944". Suit had been started in this case prior to the approval and filing of the bond, but in less than two months after the order it was filed nunc pro tunc and we see no reason to order this case discharged on account of this.

Defendant further contends that plaintiffs are not entitled to bring this suit without the joinder of the insureds.

The policy itself says:

"Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy."

It is now well settled in Pennsylvania that a person not the insured but intended to be benefited by the policy of insurance may sue the insurer without joinder of the insured: A. Rose & Son, Inc., to use, v. Zurich General Accident, etc., Co., 296 Pa. 206, 210 (1929); Graham v. United States Fidelity & Guaranty Co., 308 Pa. 534, 538 (1932); Commonwealth v. Great American Indemnity Co., 312 Pa. 183, 190 (1933).

As we have seen, two points are settled in this Commonwealth: (1) That an insurance policy may be reformed in an action in assumpsit brought to recover under it as reformed; and (2) that an action may be brought on an insurance policy by the beneficiary without the joinder of the insured. So far as we know these two rules have never been applied in the same case in Pennsylvania, but we see no reason why they cannot be.

There are a number of cases in other jurisdictions holding that an injured third person can sue the insurer for reformation of a policy without joinder of the insured. In the case of Binswanger, admr., etc., v. The Employers' Liability Assurance Corp., Ltd., 224 Mo. App. 1025, 28 S. W. (2) 448, the court permitted reformation at the suit of the injured party alone, and disposed of the defendant's contention in that case, similar to the present defendant's contention, as follows (p. 1036) :

"In this connection it is argued that 'the rule uniformly applied in determining who are entitled to reformation, limits the remedy to original parties or those in privity with them'. . . ."

"That there was such a privity between the insured and the deceased, to whom the insured owed a duty not to negligently injure, there can be no question [Citing cases, including Rose v. Zurich, 296 Pa. 206]. . . .

"It is substantially admitted by the defendant that if there is any privity between plaintiff and the insured that plaintiff is entitled to bring this suit for reformation. From the authorities we have cited it is quite apparent that such privity exists."

Some other cases in which an injured third party was allowed to ask for reformation of a policy without joinder of the insured are: Tuzinska v. The Ocean Accident & Guarantee Corp., Ltd., 241 App. Div. 598, 272 N. Y. S. 593; Remus et al. v. Protective Indemnity Co., 170 Misc. 295, 10 N. Y. S. (2nd) 14, affirmed

in 257 App. Div. 1033, 13 N. Y. S. (2nd) 800; Hunt v. Century Indemnity Co., 58 R. I. 336, 112 A. L. R. 902.

The other contentions of the defendant relate to the conduct of the trial of the case filed to No. 232 September Term, 1943. The policy of insurance provides that "no action shall lie against the company unless, as a condition precedent thereto, the insured shall have fully complied with all the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement. . . ."

The defendant contends that there was no "actual trial", as required by the policy, because the jury was not selected according to law; because the verdict, although in favor of the plaintiffs, was not "against" the defendants, and because the verdict was in an amount in excess of that claimed in the statement of claim.

The Act of June 23, 1885, P. L. 138, sec. 1, 17 PS §1142, provides that in case either party shall neglect or refuse to aid in striking the jury, the prothonotary shall strike the same on behalf of such party. In no. 232 September term, 1943, only 16 jurors, instead of 20, were called, and the plaintiff struck four, but the prothonotary struck none.

There was no objection or exception made to the selection of the jury, nor to the form of the verdict which the defendant now claims was improper, nor to the amount of the verdict, which the defendant now claims was excessive. There was no motion made for judgment n. o. v. for a new trial. The judgments were entered and the time for appeal has expired without there being any appeal.

The defendant stood aside from the contest after being invited into it and now complains of the manner in which it was carried on.

The plaintiff's statement of claim sets forth that the defendant casualty company was notified (1) of the accident, by the insureds by letter of September 28, 1943; (2) of the institution of suit against the alleged insured, by counsel for the plaintiff by letter of December 10, 1943, and (3) of the date and place of trial, by counsel for the plaintiff by letter of January 24, 1944, and that the defendant denied liability and failed to defend the action.

The defendant is now making an effort to attack the judgment collaterally. It is the settled law that in the absence of fraud or collusion a judgment or decree of a court of competent jurisdiction, valid and regular on its face, in force and unreversed, cannot be impeached by the parties thereto, or by a stranger in a collateral proceeding in the same or another court: Metzger's Est., 242 Pa. 69 (1913). Of course, an attack could be made for want of jurisdiction, but that is not involved in this case. Commonwealth ex rel. v. Howard, 138 Pa. Superior Ct. 505 (1940).

The general rule is, ". . . a judgment recovered against an insured by an injured party is conclusive on the issues there determined in a subsequent proceeding by the injured party or by the insured against the insurance carrier for indemnity, providing the carrier had notice of the suit and an opportunity to defend. . . . This is merely a specific application of the rule that a judgment against an indemnitee is conclusive in an action against the indemnitor where the indemnitor has knowledge of the suit and an opportunity to defend": Renschelr v. Pizano, 329 Pa. 249, 254 (1938).

In Keystone Lumber Co. v. Security Mutual Casualty Co., 103 Pa. Superior Ct. 154 (1931), where suit was brought on a policy of public liability insurance after judgment had been entered against the insured, the court held that as the insurance company had notice of the suit, the judgment in that action concludes the defendant insurance carrier as to the injury having been caused by the negligence of the employe

of the assured, and the latter's liability therefor, leaving as the only question the liability of the defendant under its policy. See also Fowler v. Borough of Jersey Shore, 17 Pa. Superior Ct. 366 (1901); Orth v. Consumers Gas Co., 280 Pa. 118 (1924).

In Philadelphia v. Reading Co., 295 Pa. 183 (1929), where there was an action by a city against an owner of a sidewalk to recover the amount of judgment which the city was required to pay for personal injuries suffered by reason of a defect in the sidewalk, the court said (page 190): "Having had notice to come in and defend, appellant, admitting ownership of the property along which the defective sidewalk ran, is concluded by the judgment in the prior suit so far as it determined the existence of the defect in the sidewalk, the cause of the injury, the amount of damages sustained and the liability of the city. . . ."

Commenting upon the failure of the company to appear at the trial the court said (p. 189): "It [the defendant] had declined to appear in the litigation after notice to do so and hence had no control over the course to be pursued in it. If it wished to dictate what should be done at any stage of the proceeding, it should have come in and assumed its primary burden of responsibility for the accident. It could not stand aside from the contest after being invited into it and then complain of the manner in which it was carried on. Its place was on the battle line of the defense if it wished to exercise control over the way the fighting was to be waged."

The insurance carrier elected to ignore the trial against its alleged insured and it cannot now complain of the manner in which that contest was carried on.

And now, to wit, January 29, 1945, the questions of law raised in the affidavit of defense are decided against the defendant and are dismissed. Leave is granted to the defendant to file an affidavit of defense to the facts within 15 days from this date.